831 A.2d 1134

**James H. SUMMERS**

v.

**STATE of Maryland.**

No. 2779, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Sept. 9, 2003.

364

Geraldine K. Sweeney, Assistant Public Defender (Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Rachel Marblestone Kamins, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before SONNER, ADKINS and GREENE, JJ.

ADKINS, Judge.

James H. Summers, appellant, was convicted by a jury in the Circuit Court for Baltimore City of possession of cocaine and possession of heroin. The jury did not return verdicts on charges of possession with intent to distribute heroin, posses-

sion with intent to distribute cocaine, and resisting arrest. Appellant presents two questions on appeal:

I. Did the trial court err in permitting the State to impeach him with a prior conviction for possession with intent to distribute a controlled dangerous substance?

II. Did the trial court err in denying a defense request for a mistrial because two of the jurors had discussed the case over lunch and because one of the jurors felt "harassed" by the deliberations?

We find no error and affirm the judgments.

### FACTS AND LEGAL PROCEEDINGS

On March 2, 2001, at about 5:30 p.m., Baltimore City police officers Jeff Young, Chris Maleki, and Eric Green were in plain clothes, patrolling an area near the 600 block of Cumberland Street and the 2400 block of Stockton Street in an unmarked police vehicle. As they were driving eastbound on Cumberland, they saw 25 to 30 people "running off" Cumberland onto Stockton. The officers had received complaints that narcotics were sold in the area, so they pulled onto Stockton Street to investigate.

They saw a line of people on the sidewalk, with appellant at the head of the line, facing the other individuals. He was holding a bag of gel capsules, which, according to Young, was what heroin is usually packaged in. Appellant was handing one of the gel caps to the person at the head of the line. Another individual was collecting money.

Someone yelled, "5–0," meaning that police officers were in the area. The line dispersed. Appellant ran into a vacant yard, but a fence had recently been installed. Appellant then turned around and tried to run past the officers. Appellant still had the bag of gel caps in his hand. Officer Young tried to bring "him down to the ground to make an arrest." As Young grabbed appellant, appellant "shot putted" the bag to the ground.

Young tried to arrest him but appellant "continued to roll around on the ground." Maleki recovered the baggie and held it until it was submitted to the Evidence Control Unit for analysis. Green assisted Young in arresting appellant.

After appellant was arrested, Young took him to the police station and the "wagon man" took him to Central Booking. Central Booking would not accept appellant because he had an "abrasion" near his eyebrow. The "wagon man" instead took him to the hospital. According to Young, he met appellant at the hospital, while Maleki and Green remained at the police station.

On cross-examination, defense counsel elicited from the officers that appellant was wearing a reddish-plaid shirt that day.

The baggie that appellant threw down contained 43 gel caps and seven white-top vials. Analysis of the gel caps indicated that they contained heroin. The white-top vials contained cocaine.

Appellant testified that he was standing on line waiting to buy heroin. He testified that he was an addict and had been using heroin for 17 years. Someone yelled "5-0," and everyone started running. One police officer threw him to the ground and another officer kicked him.

Appellant reported that Young was at the hospital and that, while he was there, Maleki came and told appellant that he was being charged with possession of cocaine as well. He told the jury that on the way from the hospital to Central Booking, the officers stopped at a liquor store and bought four six packs of beer. In rebuttal, Green denied that he had kicked appellant and that he stopped at any store when appellant was in the car.

## DISCUSSION

### I.

### Impeachment With A Prior Conviction

Before trial, appellant moved *in limine* to exclude evidence of a prior conviction for possession of a controlled dangerous

substance with intent to distribute. Defense counsel argued that because of the similarity of the conviction with the current charge, the jury was likely to misuse the prior conviction. She also pointed out that appellant was the only witness for the defense and that his testimony was central.

When the trial court suggested that the credibility factor favored allowing use of the prior conviction to impeach, counsel countered that appellant was not going to portray himself as "a stellar defendant," and would testify that he was waiting to buy drugs. The trial court held the issue *sub curia*, and returned to the issue after the State rested its case.

The court reviewed the criteria for determining whether to allow impeachment with a prior conviction, as set forth in *Jackson v. State*, 340 Md. 705, 717, 668 A.2d 8 (1995). The trial court ascertained that the conviction was less than 15 years old and that it was for an impeachable offense. It then considered the remaining factors: The year [was] 2000, so it is very close. That probably weighs against. Similarity, it is the same sort of offense, which of course weighs against. So what's left is the importance of the defendant's testimony and the centrality of the testimony.

> I'm instructed, of course, by *Jackson v. State* that where credibility is a central issue[,] the probative value is considered great and weighs heavily against the danger of unfair prejudice, rather than permit the [d]efendant to [portray] himself to the jury as someone without any criminal conduct in his background, the stellar picture of himself.

> I will permit the State to impeach with the conviction.

### The Parties' Contentions

Appellant contends that the trial court applied the factors set out in *Jackson* mechanically, rather than "thoughtfully," and that it gave too much weight to the centrality of appellant's testimony. Stressing the discrepancy between the officers' testimony and appellant's, the State counters that the trial court properly exercised its discretion in permitting the impeachment.

### Admissibility Of Prior Convictions

■ Md. Rule 5–609 governs admissibility of prior convictions to impeach a witness. That rule provides, in pertinent part:

[E]vidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if ... the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.

■ In *Jackson*, 340 Md. at 717, 668 A.2d 8, the Court of Appeals identified five factors for trial judges to consider when weighing the probative value of a past conviction against its prejudicial effects: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of defendant's testimony; and (5) the centrality of the defendant's credibility. Similarity between the prior conviction and the crime for which a defendant is being tried does not *per se* preclude impeachment with that conviction. *See Facon v. State*, 144 Md.App. 1, 47, 48, 796 A.2d 101 (2002), *rev'd on other grounds*, 375 Md. 435, 825 A.2d 1096 (2003).

■ Whether the probative value of impeachment evidence outweighs its prejudice is a matter within the trial court's discretion. *See Jackson*, 340 Md. at 713, 668 A.2d 8. "When the trial court exercises its discretion in these matters, we will give great deference to the court's opinion." *Id.* at 719, 668 A.2d 8.

In *Jackson*, the Court of Appeals noted that, "[w]here credibility is the central issue, the probative value of the impeachment is great, and thus weighs heavily against the danger of *unfair* prejudice." *Id.* at 721, 668 A.2d 8 (emphasis in original). In *Facon*, we concluded that the trial court did not abuse its discretion in admitting evidence of two prior convictions for armed robbery in Facon's trial on the same offense. *See Facon*, 144 Md.App. at 48, 796 A.2d 101. In

doing so, we stressed the importance of the appellant's credibility:

> [A]ppellant's credibility was of particular importance to this case. He wanted the jury to believe his version of the incident, *i.e.,* that he was high on drugs at the time of the robbery, did not use a real handgun, and did not intend to steal cigarettes. The State obviously had a different theory.

*Id.*

In this case, defense counsel similarly challenged the officers' credibility by noting that they had been waiting together outside the courtroom, by asking whether they had spoken to each other about the case, and by pointing out that all used the same phrase in describing how appellant discarded the baggie. Defense counsel had the officers describe what appellant was wearing, then introduced the property log to impeach that testimony.

Appellant testified that he was waiting to buy drugs, not selling them. In addition, he testified that Green kicked him in the face and that the officers stopped to buy liquor while taking him from the hospital to Central Booking. Appellant denied that he had been wearing a plaid jacket, showing the property sheet as evidence that he had not had one when he was arrested. He told the jury that the officers "fibbed" about him talking to someone at the police station, and that they made a mistake in arresting him.

We cannot say that the trial court abused its discretion in determining that appellant's prior conviction for distribution of a controlled dangerous substance was relevant to his credibility as a witness in this case. It is undisputed that appellant's credibility was central to the case, and that the jury's verdict would depend on whether it believed appellant or the police officers. Moreover, as the State points out, the jury was instructed that the conviction was to be used only to decide whether appellant was telling the truth, not "as any evidence that the Defendant committed the crime that's charged in this case."

In these circumstances, the trial court properly exercised its discretion in concluding that "the probative value of the impeachment is great, and thus weighs heavily against the danger of *unfair* prejudice." *Jackson*, 340 Md. at 721, 668 A.2d 8 (emphasis in original). We find no error in the court's ruling that the probative value of admitting the evidence outweighed the danger of unfair prejudice.

## II.

### Jury Deliberations

Appellant's second contention is that the trial court erred in denying his motion for a mistrial based on a discussion that occurred between two jurors during deliberations, because one of the jurors may have been coerced into reaching a verdict.

The jury retired to deliberate at 10:29 a.m. on the second day of trial. At 11:56 a.m., the trial court told counsel that they had two notes from the jury. One read: "Clarify options if we can't agree." The other read, "Please provide me with further explanation of the difference between the actual and indirect possession." The trial court responded to the notes and the jury resumed deliberation.

At 2:32 p.m., the trial court told counsel that it had two more notes. One asked whether, if the jury was deadlocked on one question but agreed as to others, the jury could return a verdict as to that count. The second note, from an "unidentified juror," read, "I feel harassed. I want off this jury because I disagree."

With counsels' concurrence, the trial court conducted a *voir dire* of the jury. It asked each juror whether anything happened during the course of deliberations that raised concerns about the juror's ability to reach an impartial verdict, and whether anything created a concern about the jury's ability to reach a fair and impartial verdict. Ten of the jurors informed the trial court that one of the jurors was not participating in the deliberations or had a closed mind. They told the trial court, however, that they could reach a fair and

impartial verdict on some of the charges. Jurors 1 and 11 also told the trial court that the jury had agreed on two counts.

The "unidentified juror" turned out to be Juror No. 4. The following exchange is relevant:

THE COURT: Has anything happened during the course of the deliberations that have raised a concern in your mind about your ability to reach a fair and impartial verdict at this trial?

JUROR NO. 4: Yes, I think so.

THE COURT: Okay, what has happened? Without identifying any particular person and do not identify for me in any way which way the jury is leaning or which way any particular member of the jury is leaning, tell me, generally, what has raised the concerns with you?

JUROR NO. 4: I think the distrust between the police and the citizens of Baltimore have—

THE COURT: Okay. Well, I'm looking more along the lines of anything happening in your deliberations that raised a concern about your ability to be fair.

JUROR NO. 4: Well, like, one of the jurors discussed the case for 20 minutes at lunchtime with me. You're not supposed to do that.

THE COURT: Okay. Again, don't identify that person.

Notwithstanding the fact that you've had that discussion, do you believe the jury can reach a fair and impartial verdict on any of the counts?

JUROR NO. 4: No.

THE COURT: On any of the counts?

JUROR NO. 4: Some of them, yes. We've already reached—

THE COURT: Okay. And you think that, notwithstanding the discussions, that the verdict you've reached so far would be fair and impartial?

JUROR NO. 4: What do you mean by so far?

THE COURT: Well, I understand you say you've got agreement on some of the counts or one of the counts—

JUROR NO. 4: Right.

THE COURT:—that you have reached agreement.

JUROR NO. 4: Right.

THE COURT: Okay. Do you believe that to be a fair and impartial verdict?

JUROR NO. 4: Yes.

After the trial court completed questioning the jurors, defense counsel moved for a mistrial, setting forth two reasons. First, counsel argued, Juror No. 4 said she had discussions with another juror during lunchtime. Second, almost all of the jury members had said that one member was not participating in the deliberations. The trial court decided to take the verdicts on the counts on which the jury had agreed.

The jury rendered verdicts of guilty on the charges of possession of cocaine and possession of heroin. They were unable to reach a verdict on the other three charges.

## The Parties' Contentions

Appellant contends that the trial court erred in denying his motion for a mistrial because one of the jurors was coerced and because a discussion between two jurors may have violated his due process rights. The State counters that the trial court's *voir dire* of the jury made clear that the verdicts rendered were untainted by coercion. It also asserts that we should infer that the lunchtime discussion occurred after the evidence was concluded, and that Juror No. 4 was not influenced by the lunchtime discussion.

## Mistrial

■ The decision of whether to grant a motion for a mistrial for juror misconduct lies within the sound discretion of the trial court. *See Carter v. State*, 366 Md. 574, 589, 785 A.2d 348 (2001); *see also Jenkins v. State*, 375 Md. 284, 299, 825 A.2d 1008 (2003)(when improper communication involving juror is basis for mistrial request, denial is reviewed for abuse of discretion).

▆▆▆▆ "A criminal defendant's right to have an impartial jury trial is one of the most fundamental rights under both the United States Constitution and the Maryland Declaration of Rights." *Id.* "The potency of the Sixth Amendment right to a fair trial relies on the promise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court." *Allen v. State,* 89 Md.App. 25, 42, 597 A.2d 489 (1991), *cert. denied,* 325 Md. 396, 601 A.2d 129 (1992) (citations omitted). A motion for a mistrial or a new trial because of alleged jury misconduct must be granted if the evidence of misconduct indicates that a fair and impartial trial could not be had under the circumstances. *See Jenkins,* at 340, 825 A.2d 1008; *Eades v. State,* 75 Md.App. 411, 420, 541 A.2d 1001, *cert. denied,* 313 Md. 611, 547 A.2d 188 (1988). Because a trial judge is in the best position to evaluate whether a defendant's right to an impartial jury has been compromised, "an appellate court will not disturb the trial court's decision on a motion for mistrial or a new trial absent a clear abuse of discretion." *Benjamin v. State,* 131 Md.App., 527, 541, 749 A.2d 273 (2000).

▆▆▆▆ In *Jenkins,* the Court of Appeals recently held that when the record is silent with respect to whether intentional and inappropriate juror contact was prejudicial, prejudice may be presumed if the nature of such contacts "raise[s] fundamental concerns on whether the jury would reach their verdict based solely upon the evidence presented at trial or whether it would be improperly influenced by the inappropriate contacts." *Jenkins,* at 301, 825 A.2d 1008; *see also Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954)("In a criminal case, any private communication [or] contact ... with a juror during a trial about the matter pending before the jury is ... deemed presumptively prejudicial"). In these circumstances, the burden falls on the State to rebut the presumption of improper influence. *See Remmer,* 347 U.S. at 229, 74 S.Ct. at 451; *Jenkins,* at 329–30, 825 A.2d 1008.

■ The *Jenkins* Court recognized, however, that not all improper communications justify a presumption of material prejudice. "[I]n certain cases, it is improper to impute prejudice where procedures have taken place to protect the defendant's rights[.]" *Jenkins*, at 311, 825 A.2d 1008. When the trial judge is able to voir dire a juror about the improper contact and to assess how it may affect the juror's prospective ability to deliberate or to render a fair verdict, the presumption of prejudice may not be warranted. *See id.* at 310–16, 825 A.2d 1008 (following *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982) and *United States v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)).

In *Jenkins*, the Court of Appeals held that prejudice would be presumed in the egregious circumstances presented there—a juror lunching with a police detective who had recently testified in a murder trial, while that case was still being tried to that juror. *See Jenkins*, at 319–21, 825 A.2d 1008. Similarly, prejudice has been presumed in other egregious circumstances. In *Turner*, the United States Supreme Court held that extensive daily contacts between a sequestered jury and two deputy sheriffs who testified at trial were presumptively prejudicial. *See Turner v. Louisiana*, 379 U.S. 466, 471–74, 85 S.Ct. 546, 549–50, 13 L.Ed.2d 424 (1965). In *Remmer*, the Supreme Court held that an unknown third party's suggestion to a juror that he could profit in rendering a certain verdict was presumptively prejudicial. *See Remmer*, 347 U.S. at 229, 74 S.Ct. at 451.

■ In contrast, "an alternate juror, who has been properly instructed not to deliberate, sitting in on the deliberations of a jury is not . . . a situation" in which prejudice must be presumed. *Jenkins*, at 315, 825 A.2d 1008 (discussing *United States v. Olano*, 507 U.S. 725, 739–40, 113 S.Ct. 1770, 1780–81, 123 L.Ed.2d 508 (1993)). Likewise, a juror sending an employment application to the district attorney's office during trial is not presumptively prejudicial. *See Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982); *Jenkins*, at 311–12, 825 A.2d 1008.

But we need not decide whether a presumption of prejudice applies in this case. In *Allen,* 89 Md.App. at 46–48, 597 A.2d 489, we assumed the presumption applied, but held that it had been rebutted because the trial court had been able to question jurors promptly and extensively about the impact of information that they received during deliberations from a dismissed alternate juror who had breakfast with a co-defendant. The dismissed juror informed a deliberating juror during a break that the co-defendant had implicated himself and exonerated his brother on some of the charges. In *Eades,* 75 Md.App. at 423–24, 541 A.2d 1001, we assumed, without deciding, that prejudice would be presumed when a juror asked her husband, who was a District of Columbia prosecutor, why the trial judge allowed a witness to testify about a hearsay statement. We held that the trial court did not err in denying a motion for a new trial because any such presumption had been overcome by the juror's responses to the court's *voir dire* questions. Here, we conclude that any presumption of prejudice was rebutted by Juror No. 4's *voir dire* responses to the trial court.

## Coercion

Appellant contends that the note sent by the unidentified juror "raised the specter of coercion." Although we agree that the note required an inquiry, the trial court took appropriate action by conducting that inquiry. We do not agree that it was an abuse of discretion for the trial court to deny appellant's motion for a mistrial.

The trial court responded to the notes from the jury by questioning the jurors. Each of the jurors, including the juror who said she was "harassed," agreed that he or she could render a fair and impartial verdict on some of the counts. Two of the jurors told the trial court that they had already reached agreement on two counts. All of the jurors, including Juror No. 4, concurred that the verdict on those two counts was a fair and impartial one. The trial court was entitled to evaluate the credibility of the responding jurors, and obviously

credited their unanimous agreement regarding those two verdicts.

This case differs from *Wright v. State*, 131 Md.App. 243, 270–71, 748 A.2d 1050, *cert. denied*, 359 Md. 335, 753 A.2d 1032 (2000), in which we concluded that the trial court could not rely on assurances by jurors, who had read newspaper articles detailing similar crimes by Wright, that they had not been affected by them. In *Wright*, we noted the inflammatory nature of the evidence and the emotional nature of the crimes; we were concerned that jurors might have been affected by the information even without realizing it. *See id.* at 270, 748 A.2d 1050. We also worried that jurors leaning toward conviction, but not completely decided, might have had their leanings confirmed by extraneous information. *See id.* Here, in contrast, there was no extraneous information and no reason to believe that Juror No. 4 would have been affected without his or her realization.

### Improper Discussion Between Jurors

 Appellant also complains that Juror No. 4 had a conversation about the case with another juror during lunch, not in the presence of the entire jury. Even assuming that another juror spoke with Juror No. 4 and was guilty of misconduct, however, we see nothing to suggest that appellant was prejudiced by the discussion.

Not every trivial act on the part of a juror during the course of the trial amounts to such misconduct as requires the withdrawal of a juror and the continuance of the case. A contrary holding would result in a multiplication of mistrials, with attendant additional expense and delay. There are many cases where the misconduct of the jury is sufficient to require an order of mistrial, but the misconduct must be such as to reasonably indicate that a fair and impartial trial could not be had under the circumstances.

*Rent–A–Car Co. v. Globe & Rutgers Fire Ins. Co.*, 163 Md. 401, 408, 163 A. 702 (1933).

■ This case differs from all of these cases we have discussed because the allegedly improper communication here occurred between two jurors, not between a juror and a witness, defendant, or third party. We find that distinction significant. Third party communication with a juror raises a concern that the juror may reach a verdict on the basis of the improper extrinsic communication rather than the evidence. *See Eades,* 75 Md.App. at 420, 541 A.2d 1001. That concern is greatly diminished when, as in this case, the improper extrinsic communication occurred solely between two jurors.

■ It is not clear from Juror No. 4's comments whether this allegedly improper lunchtime discussion occurred before or after the jury retired to deliberate. The purpose of admonishing the jury not to discuss the case among themselves during trial is to avoid having the jurors form opinions regarding the verdict before they have heard all of the evidence in the case. *See Wilson v. State,* 4 Md.App. 192, 198, 242 A.2d 194, *cert. denied,* 251 Md., 753 (1968), *cert. denied,* 394 U.S. 975, 89 S.Ct. 1467, 22 L.Ed.2d 754 (1969). Here, the jury began deliberations at approximately 10:30 in the morning, so that if the discussion took place during that lunchtime, all the evidence already had been presented. Moreover, the discussion was short and Juror No. 4 reported that it had not affected her ability to reach a fair and impartial verdict on the counts already decided.

Even if the conversation occurred the previous day, Juror No. 4 did not suggest that the other juror had made up his or her mind about the case or discussed the verdict with her. Moreover, Juror No. 4 did not detail the nature of the discussion, so there is no evidence that the other juror coerced her during the alleged conversation. The trial court was entitled to take Juror No. 4 at her word—that, notwithstanding that discussion, she had been able to reach a fair and impartial verdict on the two charges that appellant now challenges.

■ Cases from other jurisdictions reinforce our conclusion that discussions among fewer than all jurors or before

final deliberations do not require a mistrial unless there is prejudice to the defendant. *In West Virginia v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253, 263–64 (1989), the appellate court held that the trial court did not err in denying defendant's motion for a mistrial after jurors discussed the case at lunch during trial. The trial court questioned the jurors, who assured the court that they could and would determine the facts fairly. *See id.* The appellate court observed that,

> [w]hen an outsider speaks to a juror, we are most concerned, because inadmissible testimony might be received. Jury discussions among themselves, however, are less troublesome, because they have heard the same evidence in court and remain free to weigh and argue when they later retire to reach a verdict.

*Id.* at 264. *See also Illinois v. Gilyard,* 124 Ill.App.2d 95, 260 N.E.2d 364, 371–72 (1970), *cert. denied,* 402 U.S. 911, 91 S.Ct. 1388, 28 L.Ed.2d 652 (1971)(no abuse of discretion in denying mistrial after jurors who discussed exhibits while in the jury box told trial court that their partiality was unaffected); *Nebraska v. McDonald,* 230 Neb. 85, 430 N.W.2d 282, 288–90 (1988)(no abuse of discretion in trial court's determination that in-courtroom discussion between two jurors while trial court and counsel were in chambers did not prejudice defendant; in cases involving juror misbehavior only, rather than extraneous influences, burden is on defendant to show prejudice); *Kansas v. Griffin,* 262 Kan. 698, 941 P.2d 941, 945 (1997)(even if discussions among three jurors were "preliminary deliberation," defendant did not show effect on outcome of trial). *Compare People v. Saunders,* 120 Misc.2d 1087, 467 N.Y.S.2d 110, 112 (N.Y.Sup.Ct.1983)(pre-deliberation comments, including opinions as to guilt or innocence of defendant and information that defendant was a drug dealer, and use of one juror's notes may have substantially prejudiced defendant's rights and required new trial). *See generally* Dale R. Agthe, *Propriety and Effect of Jurors' Discussion of Evidence Among Themselves Before Final Submission of Criminal Case,* 21 A.L.R.4th 444 (1983 and 2001 Supp.)(collecting cases).

We hold that the trial court did not abuse its discretion in denying appellant's motion for a mistrial.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**