971 A.2d 331

**Zarzine WARDLAW**

v.

**STATE of Maryland.**

**No. 1478 Sept.Term, 2007.**

Court of Special Appeals of Maryland.

May 8, 2009.

442

Thomas M. Donnelly (R. Troy Mowery, Donnelly & Mowery LLC on the brief), Baltimore, for appellant.

Edward G. Wells (Douglas F. Gansler, Attorney General on the brief), Baltimore, for appellee.

Panel: HOLLANDER, ZARNOCH and RAYMOND G. THIEME, JR., (retired, specially assigned) JJ.

THIEME, J.

Zarzine Wardlaw, appellant, was tried before a jury sitting in the Circuit Court for Baltimore City for rape in the second degree, sexual offense in the third degree, sexual offense in the fourth degree, three counts of assault in the second degree, two counts of sexual child abuse, and two counts of incest of his 17–year old daughter, Michelle. He was convicted of three counts of assault in the second degree. The jury deadlocked on the charges of sexual child abuse and incest, and accordingly, a mistrial was declared on those counts.

Appellant was sentenced to two terms of imprisonment of ten years each, to run consecutively, for two counts of second-degree assault, with the third count merged for sentencing purposes.

On appeal, appellant presents two questions for our review, which we have reworded and reordered:

1. Did the trial court abuse its discretion when it denied appellant's motion for mistrial after a deliberating juror conducted internet research on the credibility of a State's witness and published the results to the entire jury?

2. Did the trial court abuse its discretion when, after requiring a proffer of the testimony of appellant's alibi witness, it refused to permit the witness to testify?

For the reasons which follow, we answer "yes" to the first question. Although we do not decide the second question, we shall briefly address it for future guidance of the court and the parties in the event of a retrial.

## DISCUSSION

## I.

### *Juror Misconduct*

■ Appellant contends that the trial court abused its discretion in denying his motion for a mistrial based on juror misconduct. We will only set forth those facts necessary to properly respond to appellant.

Michelle, appellant's daughter, testified that, at his behest, she had sex with appellant on three different occasions during the summer of 2006. Michelle eventually informed Cynthia Hodge about the incidents. Ms. Hodge testified that she is a therapeutic behavioral specialist and, prior to, during, and after the alleged incidents, she had been working with Michelle on behavioral issues, including anger management, communication issues, and sexual promiscuity. Ms. Hodge also testified that Michelle had been diagnosed with a learning disability, attention deficient hyperactivity disorder, oppositional defiant disorder (ODD), and bi-polar disorder. Neither Ms. Hodge nor any other witness explained what ODD is or gave any information about the disorder.

After beginning its deliberations, the jury recessed for the evening and resumed deliberations the next day. The trial court advised counsel that it had received two notes from the jury. The first note stated:

One juror indicated at the beginning of our deliberations that she researched ODD on line Wednesday evening and found that lying was a part of the illness. I am concerned

that her statement is an undue influence on the rest of the jurors. Was this okay?

Below that, in different handwriting, the note continued: "And the foreman needs to know is lying a part of the illness."

After reading the notes to counsel, the following colloquy ensued:

THE COURT: I am going to bring the jury down. I am going to remind them of my instruction that was an order at the beginning of the trial that no one was to investigate this case in any way, shape or form outside of the courtroom. And that any comment made by any juror about any information obtained in that way is not to be considered by anyone including the juror who made the comment. . . . Any comments or suggestions.

[DEFENSE COUNSEL]: Your Honor I would move for a mistrial at this point. I mean that's some pretty deep research that that juror did.

THE COURT: Well my instruction with regard to its impropriety and the fact that it's not to be considered by any of the jurors including the one who did the research I firmly believe will leave no doubt whatsoever in their minds about the fact that it was inappropriate and that they're not to consider it any way shape or form in their deliberations.

[DEFENSE COUNSEL]: Okay.

After bringing the jury into the courtroom, the trial court instructed them as follows:

THE COURT: At the very beginning of this case I gave some preliminary instructions and perhaps instruction is not as strong a direction as we might use but I gave some preliminary instructions that are binding upon you. And part of those instructions were do not research or investigate the case on your own. And any investigation by any of you of this case on your own whether it's on the internet or in any other way is not appropriate, it is not proper, and it is not to be considered by you in any way shape or form in the course of your deliberations. And to the extent anything has been said by anyone concerning such matters it is

to be disregarded by all of you including any individual who did so. I cannot make it any clearer than that. You are to base your verdict in this case on the evidence that you heard and saw in this courtroom during the trial and on nothing else.

Appellant contends that the trial court erred in denying the motion for mistrial because the juror's improper internet research and the broadcasting of her findings to the entire jury, violated his constitutional "right to an impartial jury and to be confronted with the witnesses against him." Appellant points out that the trial court failed to *voir dire* the jury. By failing to assess the effect on the jury, that lying is associated with ODD, appellant asserts that the trial court did not exercise its discretion in denying the motion for mistrial.

The State claims that the trial court did not rule on defense counsel's initial motion for a mistrial, but rather gave a curative instruction to which the defense did not object. Appellant posits that although the trial court did not expressly state it was denying the motion for a mistrial, by not granting it and moving forward instead with the curative instruction, the motion for mistrial was effectively denied.

The State further maintains that the defense "acquiesced in the trial court's decision to re-instruct the jury" and, hence, forfeited the right to appeal the issue. Appellant asserts that the State mischaracterizes the defense counsel's response to the trial court's query after the giving of that instruction.

We pause to review additional facts. After the trial court addressed the jury regarding questions raised in two different notes, including the question about the internet research, the jury was excused to continue its deliberations. The transcript then continues with the following colloquy:

THE COURT: Any other questions.

[STATE]: No Your Honor.

THE COURT: Problems.

[DEFENSE COUNSEL]: No Your Honor.

Appellant asserts that this exchange was not indicative of any acquiescence by the defense to the trial court's ruling to deny the motion for mistrial and give the curative instruction instead, but rather was a response by counsel to any "other" questions or problems counsel might wish to address on the record. We agree. *See Beverly v. State*, 349 Md. 106, 118, 707 A.2d 91 (1998) ("[O]nce [defense counsel] realized that the court was not going to change its mind, defense counsel, having vigorously argued the matter, politely continued on with the matter of the day. To deem [that] behavior acquiescence would be to ignore the reality of what goes on at the trial level.") Moreover, as discussed below, the defense later made another motion for mistrial, based on, among other things, the improper internet research. Accordingly, we are satisfied that the issue is preserved for our review. *See Benjamin v. State*, 131 Md.App. 527, 544, n. 3, 749 A.2d 273 (2000) (issue of whether trial judge erred in denying a motion for a mistrial, based on juror incompetence or unwillingness to participate in jury deliberations, was preserved for appellate review where the record indicated that counsel made at least two motions for a mistrial).

Approximately thirty-five minutes after excusing the jury to continue its deliberations, the record resumes with the following exchange:

[STATE]: Your Honor I asked [defense counsel] to return with me for the purpose of asking to join her motion for mistrial but I do believe I need to do that on the record.

THE COURT: You sure do and we need to get Mr. Wardlaw back.

. . .

[STATE]: Your Honor I just wanted to put on the record that I would like to join the defendant's previous request for a mistrial at this point.

THE COURT: Well there is no previous motion for mistrial because the motion was made. I indicated what I was going to do in response to it. There was no objection

when I indicated what I was going to do in response to it. I gave the advice to the jury. I sent them back upstairs. They've been back upstairs at least 45 more minutes. Thirty minutes of that was before you came back in the court and indicated you wanted to join the motion with [defense counsel] which is as far as I'm concerned is no longer still viable and pending.

The time to have objected would've been either before I gave my instruction after I indicated what I intended to do or certainly after I gave my instruction if you were dissatisfied in some way with the effect of my instruction to the jury. You did neither and now my opportunity to either add or subtract or alter what I did in an attempt to avoid the appropriateness or whatever argument you intended to make in support of a mistrial has now passed.

So your attempt is noted for the record but my reaction to it is with respect of the issue concerning independent research that issue has come and gone and to the extent there was an available motion for mistrial on that basis was waived for failure to complain when I gave my limited instruction okay?

[DEFENSE COUNSEL]: Okay.

THE COURT: Anything else. I mean you can renew your-obviously you can make a motion for mistrial at any time and you can argue whatever you'd like to make but with respect to that issue I do think the time to have made it would've been when I had the opportunity to either add or subtract from what I did to attempt to correct whatever damage may or may not have been done by the indication in note number four. Now that doesn't mean you can't renew your motion at some point and say what I did was inadequate. But as far as I'm concerned I did what I did. They've been deliberating together on that basis and without objection for at least 30 minutes before it was first raised again. I'm not going to bring that out again.

[STATE]: Well can I–I get from what you just said Your Honor that I can make a motion for mistrial any time and—

THE COURT: Well under the rules. Whatever the rules provide but I think on that grounds it would be my view that the time to have made it would've been a failure of which it is waived.

[STATE]: Can I still put it on the record Your Honor or are you telling me—

THE COURT: Well you have. You have and I've denied it on the basis of what I just said.

[STATE]: Okay.

[DEFENSE COUNSEL]: Thank you.

THE COURT: Would you like to join [the State's] motion for mistrial?

[DEFENSE COUNSEL]: No, I don't actually think that it hurts me it's just the whole idea of somebody doing research when you were very clear in telling them not to and they did it on the same day that you told them not to.

THE COURT: Well it's very frustrating it happened. I do think with regard to my instruction to disregard whatever was done but for the person that did it and for the remainder of the jury it was given in such a way that I believe they will not use that in their consideration in reaching a verdict. Just as if they had heard something improper during the course of the trial and I move to strike it or disregard it. You can't remove from their minds that they've heard it but you can in a way that you give a limited instruction what you say and how you say it make it clear that that should play no part in their deliberations and I'm satisfied I've done that.

Obviously the Court of Appeals could disagree at some point in time. **I feel comfortable with what I did and I think in the interest of justice it would be certainly an unfortunate result if the families on either side it would be in this case face the necessity of retrying the case and I don't see a basis to do that for this reason at this time.**

[DEFENSE COUNSEL]: Okay.

(Emphasis added.)

Later that day, the court was advised that the jury had reached a verdict. When the jury was polled after the reading of the verdict, however, two jurors stated that their verdict was not the same as the verdict announced by the foreman. After the trial court instructed the jury to resume deliberations, the following colloquy ensued between the court and counsel:

[DEFENSE COUNSEL]: Your Honor, **I move for a mistrial** because the jury has been deliberating now for two days. We've had a number of notes from them. One asking for repeat instructions. Another one asking whether third and fourth degree required penetration. **And then we have the note where the one juror apparently had researched some issues involving the case over night and told the other jurors about it.**

In light of the fact that they have been deliberating for two days in this case, that they have had those kind of questions, and the fact that two jurors now do not agree with the verdict that any verdict they come back with not [sic] is going to be a coercion verdict because somebody's going to feel pressured to change their mind. I just think that this is really a hung jury and we should have mistrial.

THE COURT: Mr. Tan would you like to be heard?

[STATE]: I'll submit. I'll join [defense counsel] but I don't want to make an argument.

THE COURT: Okay [defense counsel] I understand your concerns and I consider all of them. However, they have not been deliberating two days. . . .

With regard to the questions I don't find either the number of the questions or the subject of the questions troubling in any way shape or form. **The only one that comes close is the revelation that one of the jurors had done some internet research.** But for the reasons I previously stated on the record **I am satisfied with my curative instruction in that regard dealt with that issue**

**appropriately and that that alone or in combination with the other questions gives me no reason to think there ought to be a mistrial.**

. . .

So for all of those reasons, a motion for mistrial is denied and we'll have them return at 2:45 and resume. Thank you.

[DEFENSE COUNSEL]: Your Honor thank you.

(Emphasis added.)

We review the denial of a motion for a mistrial based on juror misconduct discovered during the course of a trial under the abuse of discretion standard. *Jenkins v. State,* 375 Md. 284, 298–99, 825 A.2d 1008 (2003). "Our determination of whether a trial court abused its discretion 'usually depends on the particular facts of the case [and] the context in which the discretion was exercised.'" *King v. State,* 407 Md. 682, 697, 967 A.2d 790 (2009) (quoting *Myer v. State,* 403 Md. 463, 486, 943 A.2d 615 (2008)).

Our determination of whether the trial court abused its discretion in denying appellant's motion for mistrial must be assessed in relation to appellant's right to an impartial jury. "A criminal defendant's right to have an impartial jury is one of the most fundamental rights under both the United States Constitution and the Maryland Declaration of Rights." *Jenkins,* 375 Md. at 299, 825 A.2d 1008. "The potency of the *Sixth Amendment* right to a fair trial relies on the promise that a defendant's fate will be determined by an impartial fact finder who depends solely on the evidence and argument introduced in open court." *Summers v. State,* 152 Md.App. 362, 375, 831 A.2d 1134 (quoting *Allen v. State,* 89 Md.App. 25, 42, 597 A.2d 489, *cert. denied,* 325 Md. 396, 601 A.2d 129 (1992)), *cert. denied,* 378 Md. 619, 837 A.2d 929 (2003).

Article 21 of the Maryland Declaration of Rights also guarantees that a defendant in a criminal trial "ought not be found guilty without the unanimous consent of the jurors." "The concept of unanimity [ ] embraces not only numerical

completeness but also completeness of assent, *i.e.,* each juror making his or her decision freely and voluntarily, without being swayed or tainted by outside influences." *Caldwell v. State,* 164 Md.App. 612, 635, 884 A.2d 199 (2005).

■■ "A motion for a mistrial or a new trial because of alleged jury misconduct must be granted if the evidence of misconduct indicates that a fair and impartial trial could not be had under the circumstances." *Summers,* 152 Md.App. at 362, 831 A.2d 1134 (citations omitted). "A right as fundamental as the right to an impartial jury cannot be compromised by even the hint of possible bias or prejudice that is not affirmatively rebutted." *Jenkins,* 375 Md. at 319, 825 A.2d 1008.

The Court of Appeals has recognized the importance of safeguarding the integrity of the jury, for the sake of both a criminal defendant and the judicial system itself:

We must zealously guard against any actions or situations which would raise the slightest suspicion that the jury in a criminal case had been [improperly] influenced ... *so as to be favorable to either the State or the defendant.* Any lesser degree of vigilance would foster suspicion and distrust and risk erosion of the public's confidence in the integrity of our jury system.

*Butler and Lowery v. State,* 392 Md. 169, 180, 896 A.2d 359 (2006) (quoting *Jenkins,* 375 Md. at 339–40, 825 A.2d 1008, in turn quoting *State v. Wilson,* 314 N.C. 653, 656, 336 S.E.2d 76 (1985)) (emphasis added).

■■ Here, the juror's internet research of ODD, and her subsequent reporting of her finding, rightly or wrongly, that lying is associated with the disorder, constituted egregious misconduct. Michelle's credibility was a crucial issue, as there was no other evidence to substantiate her allegations. The juror's note to the court raised a concern that the improperly obtained information was "an undue influence on the rest of the jurors." Given the fact that this misconduct came to light while the jury was still deliberating, and was presumptively prejudicial to either the State or appellant, it was incumbent upon the trial court to *voir dire* the jurors to determine

whether they could still render an impartial verdict based solely on the evidence presented at trial. *Jenkins*, 375 Md. at 319, 825 A.2d 1008 (a presumption of prejudice attaches to egregious juror misconduct); *Butler and Lowery*, 392 Md. at 189–191, 896 A.2d 359 (a *voir dire* of the jury is an efficacious means of determining whether the jury can still render an impartial verdict after the discovery of juror misconduct). *See also Summers*, 152 Md.App. at 375, 831 A.2d 1134 ("When the record is silent with respect to whether intentional and inappropriate juror contact was prejudicial, prejudice may be presumed if the nature of such contacts) 'raises fundamental concerns on whether the jury would reach their verdict based solely upon the evidence presented at trial or whether it would be improperly influenced by the inappropriate contacts.' " (quoting *Jenkins*, 375 Md. at 297, 825 A.2d 1008).

In this case, the trial court did not *voir dire* the jury, but instead gave a curative instruction admonishing the jury not to conduct outside research and reminding them that they were to render a verdict based only on the evidence presented at trial. It was error for the court to do so, because a specific inquiry into the thought processes of the jury was the only method of ascertaining whether the information about ODD, acquired through the juror's internet research, improperly and irreparably influenced the jury's deliberative process to the prejudice of appellant or the State. *Jenkins*, 375 Md. at 329–30, 332, 825 A.2d 1008 (the only method of affirmatively rebutting the presumption of prejudice based on egregious juror misconduct was to *voir dire* the juror about the inappropriate conduct and its impact on his decision-making ability). *See also Morris v. Wilson*, 74 Md.App. 663, 680, 539 A.2d 1151 (1988) (it was incumbent upon the trial judge to *voir dire* a sworn juror, upon subsequent disclosure of his personal bias, to determine if that juror could render a fair and impartial verdict), *aff'd*, *Wilson v. Morris*, 317 Md. 284, 303, 563 A.2d 392 (1989).

Because the trial court did not *voir dire* the jury in the instant case, the presumption of prejudice was not rebutted and the trial court denied the motion without exercising its

discretion. *Williams v. State,* 394 Md. 98, 113, 904 A.2d 534 (2006) (In ruling on a motion for a new trial, based upon a revelation that a juror failed to disclose a potential bias, "the trial court's sound discretion can only be exercised *on the basis of the information that a voir dire reveals and the findings that the trial court makes as a result.*") (emphasis in the original); *Maddox v. Stone,* 174 Md.App. 489, 501, 921 A.2d 912 (2007) (We will "reverse a decision that is committed to the sound discretion of the trial court if we are unable to discern from the record that there was an analysis of the relevant facts and circumstances that resulted in the *exercise* of discretion.") (emphasis in the original). Moreover, we are not persuaded that the error was harmless beyond a reasonable doubt. Accordingly, we hold that the trial court abused its discretion in denying appellant's motion for mistrial and, therefore, we reverse the judgments of the circuit court.

## II.

### *Alibi Witness*

Appellant contends that the trial court abused its discretion, and violated his constitutional rights to present a defense and to compulsory process, when it excluded his "only alibi" witness from testifying in his defense.

We pause to review additional facts.

The State's case was based on Michelle's allegations that her father had sex with her on three different occasions during the summer of 2006. The first two incidents allegedly took place at the home of Michelle's paternal grandparents, while she was temporarily in the care of her father. Michelle testified that, although she could not remember the exact dates, she stayed with her father at her paternal grandparent's home in July of 2006 for "about three weeks or so maybe more." Michelle's maternal grandmother, who was Michelle's guardian and with whom Michelle resided testified, however, that Michelle stayed with her father at the paternal grandparents home from July 21–27, 2006. The State utilized those dates when charging appellant.

Michelle testified that she and appellant slept in the basement and that they "had intercourse" on two occasions. When asked if it was voluntary on her part, she testified: "Not really. No." She said she had sex with her father because she was "afraid that he was going to come after" her if she refused.

Michelle also testified that she went to a family reunion in North Carolina with appellant and Diane Garrett, appellant's girlfriend. Although she remembered that the trip lasted a "couple of days," she could not remember the dates. On this point, Michelle testified as follows:

[DEFENSE COUNSEL]: Okay do you remember going to North Carolina to a family reunion?

MICHELLE: Yeah.

[DEFENSE COUNSEL]: When was that?

MICHELLE: That was a couple of days. I think it was. I'm not sure. I'm not sure. I just I'm not sure when I just know we went up there and I know it was okay up there you know it was all right. It wasn't all that.

[DEFENSE COUNSEL]: You liked it in North Carolina.

MICHELLE: Yeah I liked it but you know there was times there I had gotten upset when we was down there because I felt as though you know I was being I wasn't being paid attention to.

[DEFENSE COUNSEL]: Uh-huh and what did you do when that would happen?

MICHELLE: I would get mad and pout.

[DEFENSE COUNSEL]: Pout. Okay. Who was with you in North Carolina?

MICHELLE: It was me, my dad um me and my father, Ms. Diane, and Ms. Diane's home girl.

[DEFENSE COUNSEL]: Okay and would this [trip to North Carolina] have been when [the baby] was in the hospital?

MICHELLE: Yes. This is I think so, yes this is when Micah was in the hospital.

[DEFENSE COUNSEL]: Okay so it was during that time when you were living with your other grandparents.

MICHELLE: I think so, yes.

After the State rested its case in chief, but before the defense began its case, the following colloquy ensued between the trial court and counsel regarding certain witnesses the defense intended to call.

[STATE]:—I have a question regarding [the defense] witnesses. I don't know if I should bring it up here now at the bench.

THE COURT: Well I don't know what the question is so I can't tell you whether it's the right time or not but why don't you tell us what it is.

[STATE]: Right. Well I understand [appellant's parents] testifying because they live at the address of one of the alleged incidents. Likewise, I'm sorry I forget the name but [appellant's] girlfriend lives at—

[DEFENSE COUNSEL]: Ms. Garrett.

[STATE]: But for the other two witnesses I don't understand what their relevance is of any testimony.

THE COURT: Who are the other two?

Defense counsel named appellant's sister, India Banks, as one of the two witnesses and proffered that Ms. Banks would testify that she saw Michelle and appellant at a family gathering on August 27, 2006, and observed no change in their behavior towards one another. The colloquy then continued:

[DEFENSE COUNSEL]: Okay. And the other one is Carlina Carter. She is a relative of Diane Garrett's and was present at the family reunion that [Michelle] went to with [appellant] and Ms. Garrett during that week that this supposedly happened

THE COURT: This is the different reunion than the one in North Carolina.

[DEFENSE COUNSEL]: No this is the North Carolina reunion.

THE COURT: Well how is her testimony different than India Banks?

[DEFENSE COUNSEL]: Well this is the week that the incidences supposedly happened

[STATE]: You're talking about July 21st through the 27th.

[DEFENSE COUNSEL]: Yes from the first [sic] to the twenty-seventh.

[STATE]: Were they in North Carolina then?

[DEFENSE COUNSEL]: Yes. There was a period—that she's saying it happened some time in that week but for at least four days she was with [appellant,] his girlfriend and his girlfriend's family members. So her testimony as far as what she was doing is not correct because she wasn't living at [the paternal grandparents' house] the whole time.

[STATE]: This is an alibi. Your client didn't give me notice.

[DEFENSE COUNSEL]: I did give you notice. I actually call them all alibi witnesses but she's [Carlina Carter] the only one who really would fit into that.

THE COURT: So she's going to testify that between July 21 through July 27, four days of that—

[DEFENSE COUNSEL]: Right.

THE COURT: Michelle was in North Carolina.

[DEFENSE COUNSEL]: Right. And Michelle even testified herself about—

THE COURT: Are there two trips to North Carolina because I thought you just said India Banks was testifying to August 27, 2006?

[DEFENSE COUNSEL]: That's a family gathering here in this area.

THE COURT: Okay.

[DEFENSE COUNSEL]: That was like a cook out or something.

THE COURT: Okay and Ms. Carter is testifying about the North Carolina trip four days between July 21 and July 27 right.

[DEFENSE COUNSEL]: Right.

THE COURT: Is there any independent corroborating evidence of the trip occurring during those dates? Gas receipts or hotel receipts.

[DEFENSE COUNSEL]: No she's sort of my corroborating witness because she's the one who's [not] connected to any of these people. She doesn't even—

THE COURT: Is there any independent corroboration when the—

[DEFENSE COUNSEL]: Not documents just witnesses. Just other witnesses.

[STATE]: What about Michelle?

[DEFENSE COUNSEL]: Well Michelle herself testified that she went to it.

[STATE]: She didn't testify—

THE COURT: She didn't say between July 21 and July 27.

[DEFENSE COUNSEL]: I believe that is. Okay well that's what I thought she said that's when she was living with her grandparents was when that happened.

THE COURT: Well but she testified she was living with her grandparents for two or three weeks.

[DEFENSE COUNSEL]: Right.

THE COURT: Which would be a wider window than the 21 through the 27.

[DEFENSE COUNSEL]: Right but even—

[APPELLANT]: Excuse me Your Honor.

[DEFENSE COUNSEL]: No no remain silent.

THE COURT: Well if that's your proffer then I will permit it. Obviously she'll be subject to cross examination on that subject.

[DEFENSE COUNSEL]: My proffer is based on my view of the evidence that although [Michelle] could not

identify any specific dates that she recognizes that there was a period of time that she lived with her grandparents and it was during that period of time that she went to this family reunion. Her grandmother [Ms. Polley] testified—

THE COURT: This is the record so far.

[DEFENSE COUNSEL]: Okay.

THE COURT: But the window for that to have occurred according to Michelle's testimony is two to three weeks. The window within which the allegation of the sex offense is having to occurred is July 21 through July 27.

[DEFENSE COUNSEL]: Right.

THE COURT: So there's nothing inconsistent between what the record is so far as to the times with the grandparents or the trips to North Carolina and when the offenses are alleged to have occurred.

Now if you are proffering that your witness can get on the stand and say that the trip to North Carolina included four days of the July 21 through July 27 period—

[DEFENSE COUNSEL]: Right that's the only part she can testify to. And I called her based on the testimony of Ms. Polley who said that is when Michelle lived with her grandparents was the 21 through the 27.

THE COURT: Well those aren't inconsistent. The only issue is whether all or any part of the six-day period is when this is alleged to have occurred the first two times includes time during which the defendant [, Michelle] and others were at a family reunion in North Carolina.

[DEFENSE COUNSEL]: Right.

THE COURT: And I'm frankly concerned that we're going to have a witness who says oh yes we went to North Carolina on July 25 or July 24 but there is no independent corroborating documents whatsoever to establish those dates rather only a family member who gets on the stand and says this is when we went.

[DEFENSE COUNSEL]: Right well Diane—

THE COURT: They didn't buy gasoline.

[DEFENSE COUNSEL]: Well I'm sure they did but they weren't gathering evidence to defend somebody against these kinds of accusations. I mean this never even came to light until late September. It's not like—

THE COURT: Okay well as I said I'll permit it and obviously as with any witness the State will have the opportunity to cross examine Ms. Carter.

[DEFENSE COUNSEL]: No I've made these witnesses available to the State. He can talk to them anytime he wants. They're out in the hallway and they were here yesterday.

THE COURT: We're ready to start my trial and this is just coming up now as far as the court's aware.

[STATE]: The option I guess would be to call the lady in here and ask her can you testify as to when (inaudible).

THE COURT: Well that seems sensible as the court would proffer. Sure.

[DEFENSE COUNSEL]: Okay lets see if she's here.

Ms. Carter then entered the courtroom and the colloquy continued:

THE COURT: Ms. Carter good morning. Evidentiary questions have arisen in which the court needs the benefit of a proffer of evidence which means the representation of what your testimony would be if you gave it on a particular subject. You attended a North Carolina family reunion with [appellant] and Michelle and others last year is that correct?

MS. CARTER: Um-hum.

THE COURT: And what were the dates of that.

MS. CARTER: I know it was July. **I can't remember exactly what date it was. I think it was the 28 or somewhere around there.**

THE COURT: Okay thank you.

[DEFENSE COUNSEL]: Could you relate it to any event that you remember?

MS. CARTER: Actually I just know that my mother her car had a blow out on her tire when we were going down there and the whole family was altogether. My son was there and just getting to know new people and things like that.

THE COURT: Okay thank you very much.

[DEFENSE COUNSEL]: **But you don't remember the exact date.**

MS. CARTER: **No, I don't remember.**

THE COURT: Thank you. Ms. Carter you can step back and counsel if you would just remain. Thank you.

End of July, July 28 that's not inconsistent with the record as it presently exist[s] and I don't think she has anything to add to what the testimony would be in terms of the behavior being the same based on the dates.

[DEFENSE COUNSEL]: Okay.

(Emphasis added.)

The defense then called Johnny Wardlaw, appellant's father and Michelle's paternal grandfather. Although he could not recall the specific dates, Mr. Wardlaw testified that Michelle stayed at his house in July of 2006 for less than one week and then stayed with her maternal aunt. Mr. Wardlaw testified that Michelle slept on the floor in the dining room and appellant slept upstairs in a bedroom.

Appellant then called his girlfriend, Diane Garrett, who testified about the North Carolina trip:

[DEFENSE COUNSEL]: Do you recall going with or taking [Michelle and appellant] to a family reunion?

MS. GARRETT: Yes.

[DEFENSE COUNSEL]: And when was that.

MS. GARRETT: It was the 25 of July.

[DEFENSE COUNSEL]: Okay and where was that?

MS. GARRETT: In North Carolina.

. . .

[DEFENSE COUNSEL]: And how many days were you down there?

MS. GARRETT: It was two and a half. About three. We traveled down. The cookout was that Saturday and we traveled back that Sunday.

India Banks, appellant's sister, testified that she was with appellant and Michelle at a family cook out on August 27, 2006 and did not notice that her brother acted in any inappropriate manner toward Michelle. The defense then rested its case.

Appellant contends that the trial court erred when it "forced defense counsel to proffer what appellant's witnesses would testify to and ruled on the admissibility of their testimony, improperly precluding an alibi defense witness from testifying." In support of this proposition, appellant relies heavily on *Kelly v. State,* 392 Md. 511, 898 A.2d 419 (2006).

Appellant further claims that Carlina Carter, his "only alibi witness," had "both material and relevant testimony that would have proved favorable for appellant" and she would have "provided insight as to certain dates of a trip to North Carolina" which "contradicted testimony from the State's witnesses and provided a timeline where one had been absent."

The State contends that the issue is not preserved for appeal. Nonetheless, the State claims that Ms. Carter's testimony was irrelevant because she could not recall the exact dates of the North Carolina family reunion. The State, therefore, asserts that the trial court did not abuse its discretion in excluding Ms. Carter's testimony.

We shall not comment on the preservation contention, as we are briefly addressing appellant's second question merely for the guidance of the parties in the event of a retrial.

We note that, in an appeal challenging a trial court's decision to exclude a defense witness's testimony, we utilize the abuse of discretion standard of review and will not reverse absent a showing of a clear abuse of discretion. *Kelly,* 392 Md. at 511–12, 898 A.2d 419.

 We agree with the State that the trial court did not abuse its discretion in excluding Ms. Carter's testimony. There was no dispute that Michelle accompanied her father and Ms. Garrett to North Carolina in the summer of 2006. Both Michelle and her maternal grandmother, Barbara Polley, testified to that fact. The only issue was whether the trip occurred between July 21 and 27, the alleged time frame of the first two alleged sexual encounters between appellant and Michelle that allegedly took place at the paternal grandparents home. Neither Michelle nor Ms. Polley could remember the dates of the trip, although Ms. Polley believed that the trip took place while Michelle was living with her, not when Michelle was in the temporary care of appellant.

The offer of proof established that Ms. Carter could not remember the date of the North Carolina trip and could state only that the trip occurred "somewhere around" July 28th, a date *after* the "window" in which the alleged sexual encounters took place. When pressed by defense counsel about whether she could remember the "exact date," Ms. Carter, again, replied: "No, I don't remember." Hence, Ms. Carter's testimony would not have been material or favorable to appellant's defense. *Muhammad v. State*, 177 Md.App. 188, 272, 934 A.2d 1059 (2007) (to establish a violation of the Sixth Amendment right to present witnesses in one's defense, "a defendant must show that the testimony in issue 'would be both admissible and helpful to the defense' ") (quoting *Wilson v. State*, 345 Md. 437, 448, 693 A.2d 344 (1997)).

Appellant's contention that Ms. Carter should have been allowed to testify because she was his "only alibi" witness is unpersuasive. As noted above, the record indicates that Ms. Garrett, also a defense witness, testified about the trip to North Carolina, claiming that the family reunion was held on July 25th and they were gone for about three days. She testified: "The cookout was that Saturday and we traveled back that Sunday."

Appellant's reliance on *Kelly*, *supra*, is misplaced. In *Kelly*, the defense was required to proffer the testimony of its only

witnesses, two of whom were present and ready to testify. *Kelly,* 392 Md. at 520–26, 898 A.2d 419. After hearing a proffer of their testimony from counsel, the trial court ruled that the defense could not call any of its three witnesses, because the questions defense counsel proposed to ask them would only elicit hearsay testimony and other testimony sought to be elicited would not be relevant. *Id.* at 523, 527, 529, 898 A.2d 419. The majority of the Court of Appeals held that the trial court erred, as the testimony "presumably could have been favorable" to the defendant *and* admissible absent a timely objection by the State and, thus, the court's refusal to allow them to take the stand was "premature." *Id.* at 538, 540–41, 898 A.2d 419. The Court noted that "the defendant was effectively denied the only defense available to him—the witnesses he hoped would provide favorable testimony." *Id.* at 533, 898 A.2d 419. As we have seen, that was not the situation in this case as Ms. Carter was examined by the court and, only thereafter, her testimony deemed irrelevant in light of her inability to recall the dates of the North Carolina trip.

Accordingly, we are not convinced that the trial court abused its discretion when it excluded Ms. Carter from testifying.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR FURTHER PROCEEDINGS.**

**COSTS TO BE PAID BY MAYOR AND CITY COUNCIL OF BALTIMORE.**