*Troy Sherman Nash v. State of Maryland*, No. 60, September Term, 2013

**Criminal Law – Allegations of Juror Misconduct – *Voir dire* –**
The trial judge did not abuse her discretion by failing to conduct a *sua sponte voir dire* of the jurors before denying defendant's mistrial motion, which was based on a note from the foreperson, received during deliberations after 5:00 PM on the Friday before a three-day holiday weekend, stating that another juror indicated a willingness to change her initial position of voting not guilty if it would allow her to go home and not return. The note did not constitute the type of excessive or egregious juror misconduct for which the Court applied previously a rebuttable presumption of prejudice that would require *voir dire* by the trial judge, nor were there factual issues that had to be resolved necessarily by *voir dire*. Additionally, it was not necessary for the trial judge to conduct *voir dire* to obtain assurance from the jurors of their ability to render an impartial verdict.

**Criminal Law – Jury Instructions – Modified *Allen* Charge –**
The trial judge did not abuse her discretion by refusing defense counsel's request to give the modified *Allen* instruction, reflected in Maryland Criminal Pattern Jury Instruction 2:01, following the jury note issued while deliberations were in progress, but before a deadlock was confirmed.

**Criminal Law – Maryland Rules – Adequacy of Response to a Jury Note –**
The trial judge did not violate Maryland Rule 4-326(d) by choosing, after receiving a note from the foreperson of the jury, to recess for a holiday weekend with additional instructions reminding the jurors of their duties. Although the judge's additional instructions did not refer explicitly to the concern raised in the foreperson's note to the court, the judge's actions constituted a response, within the plain meaning of the Rule's language, and the response was not unsuitable under the circumstances.

Circuit Court for Prince George's County
Case No. CT 09-1808X
Argued: 6 March 2014

IN THE COURT OF APPEALS OF
MARYLAND

No. 60

September Term, 2013

_____

TROY SHERMAN NASH

v.

STATE OF MARYLAND

_____

Barbera, C.J.,
Harrell,
Battaglia,
Greene,
Adkins,
McDonald,
Watts,

JJ.

_____

Opinion by Harrell, J.
Battaglia, Adkins, and McDonald, JJ.,
dissent in part.

_____

Filed: June 20, 2014

In a trial court judge's management of a trial, few circumstances come fraught with as much peril as the receipt of a note from a deliberating jury.  Whether to deal with it?  How to deal with it?  Some jury notes contain innocuous questions or statements to which a presiding judge may respond with ease.  Other notes may pose, however, more problematic questions or statements that place a judge between a modern Scylla and Charybdis.  Although the judge may want to be helpful in responding to the jury, he or she must take care not to be coercive or suggestive of an outcome.  A quick response may be in the best interests of everyone involved, but rashness is rewarded with reversal oft-times.  Always at the ready are the litigants and their attorneys, on edge after a hard-fought trial, with motions, requests for curative instructions, or other proposed courses of action that may be influenced by their respective advocacy interests in the outcome of the trial.  Looming too are we, the appellate courts, ready to swoop in from our high perch to scrutinize, in hindsight and with the benefit of briefs, every aspect of the decisions the trial judge had to make in real-time.

The present criminal case embraces most of these rhetorical considerations.  We consider three challenges to the course of action chosen by a trial judge in response to a note from the foreperson of the jury, received during deliberations after 5:00 PM on the Friday before a three-day holiday weekend, claiming that a fellow juror stated she was willing to change her original position of voting "not guilty" if it would mean she could go home and not return to the courthouse.  We shall hold that the trial judge, in dealing with this note, did not abuse her discretion by denying the defendant's motion for a mistrial and refusing a defense request to give a modified *Allen* instruction; nor did she

violate Maryland Rule 4-326(d) by recessing for the long weekend, after giving additional instructions reminding the jurors of their proper duties. Accordingly, we shall affirm the judgment of the Court of Special Appeals, which affirmed the judgment of the trial court.

## PERTINENT FACTS & PROCEDURAL BACKGROUND

On 17 December 2009, a grand jury, sitting in Prince George's County, returned an indictment charging Troy Sherman Nash with one count of murder in the first degree, based on an investigation into the death of Vanessa Riddick. The case proceeded to trial in the Circuit Court for Prince George's County, beginning with jury selection on Tuesday, 30 August 2011. On that day, the venire arrived at the courthouse at 7:00 AM. *Voir dire* started at 9:50 AM. After the jury was selected and the court's opening instructions delivered, the trial continued with opening statements from counsel for both parties, followed by the testimony of two State's witnesses. The court recessed for the day just after 4:00 PM, after instructing the jurors to return the following morning by 9:15 AM. The trial resumed with the testimony of four additional witnesses on Wednesday and five on Thursday. The proceedings on each of those days began before 10:00 AM and ended after 4:30 PM.

On Friday, 2 September 2011, the fourth day of trial, the jury began hearing evidence at 10:14 AM. Upon completion of the testimony of the final witness at 10:57 AM, the court excused the jury with a direction to return at 12:30 PM. A medical problem with a juror resulted in the substitution of an alternate juror and delayed the resumption of proceedings until 1:18 PM. For the next hour and twenty minutes, the jury

-2-

heard the court's concluding instructions and closing arguments from counsel.  At 2:40 PM, the jury retired to begin deliberations.  At 5:02 PM, the court received a note from the jury (the "Note"), which read literally:  "I dont believe the defendant is being give a fair verdict based on one of the juror stating out loud that she will vote guilty because she want to go home and not return!  When she previously said no guilty." The Note was signed by the foreperson and dated "9/2/11."

Following the court's receipt of the Note, counsel for the parties were brought back to the courtroom.  The trial judge read the contents of the Note into the record.  The following colloquy between the court and counsel ensued:

> **Defense Counsel:** Your Honor, as the Court can understand, the note is of some concern to us, and we would be – and based on the concern expressed by the foreman in that note, we would move for a mistrial.
>
> **Prosecutor:** And the State is objecting to that, Your Honor.  And the reason why, is because that note – in my opinion, that's an impermissible note, because that's diving into what's happening in the jury room, and that's something that we really shouldn't be made aware of, of what's going on in the jury room.
> The State, at this point, would advise that perhaps we should release them for the night.
>
> **The Court:** Well, I was thinking that I would maybe release them.  It might just be that people are tired and they need to go home and relax and come back the next day.  Because it just seems, to me, that somebody was just tired and wants to go home.  I'm inclined to do that, rather than grant your mistrial.
>
> **Defense Counsel:** Well, the only thing that I would say is, is that I understand that the Court is trying to find a solution to the problem, short of a mistrial, because we've put, you know, four hard days in.  But the difficulty that I have is, if we were to come back on Tuesday morning,[1] it

---

[1] Monday, 5 September 2011, was a court holiday.

would be Tuesday morning, and essentially, if they then go back and there's a quick verdict, then this problem still exists.

It seems like the foreman – that the foreman has alerted the Court – and I think properly so – has alerted the Court that a juror has voted guilty for convenience and expediency, rather than from a sense of, that's the proper verdict after our deliberations.

And so, I don't – I foresee that, coming back Tuesday, that it isn't going to change the desire of – you know, or the problem, that the Court is addressing this afternoon.

So based on that, I understand what the Court has said you're inclined to do, but I would renew my motion for a mistrial.

**Prosecutor:** Your Honor, I see no difference between this note and your previous instruction to the jury that they should not tell you what the numbers are.

And that's because, what's going on back there, where they are, before a verdict, is not something that we should know about, and that's what that note is doing and that's information that we shouldn't have known.

**The Court:** Well, but we know about it, so we have to deal with it.

**Defense Counsel:** And we know about it now.

**The Court:** Okay.

**Prosecutor:** And so, what I'm suggesting, is that we do release the jury at this point and have them return on Tuesday.

**Defense Counsel:** And the other thing that I would point out – and again, the foreperson, while there's an inference in the note about what the split may have been or might be, the –

**The Court:** But we don't know that.

**Defense Counsel:** Well, I'll tell the Court that I've had notes which I thought were saying exactly that the jury was about to return a verdict one way, and then the opposite – and then the jury came back the other way.

So what I'm saying to you is that that – that I know that the foreman was careful to follow the Court's instructions, and it's –

**The Court:** Yeah, well I don't think it's –

**Defense Counsel:** And I would –

**The Court:** First, wait a minute.

It's not a numerical breakdown, by any means, this note. And because I don't – it's just a – it's a concern that the foreman has, and that's okay. He has a concern he thought he should bring to the Court's attention, which he has done.

But I – you know, it is almost 20 minutes after 5:00, and the jury has been deliberating since – what was that – 2:40, which isn't a lot of time, if you're earlier in the day, but they had been here all day. And if you'll recall, we did give them a very lengthy break. And I just think it may be a matter of just someone being really tired.

So I am inclined to release them and have them come back Tuesday.

The conversation continued with defense counsel addressing three additional points. First, he requested that the judge refuse to receive a verdict that evening, in light of the Note and anticipating the jury might claim to have reached a verdict between sending out the Note and being brought back into the courtroom. Second, defense counsel proposed that another judge receive the jury on Tuesday morning for further deliberations because the presiding judge would not be available that day at the normal start of court. The presiding judge agreed to the latter suggestion. Third, defense counsel asked that the Court inquire of the jury as to whether it would be impossible for any of the jurors to return on Tuesday and asked the court to grant a mistrial if any of them could not return, because no alternate jurors remained.[2]

Before the judge could respond to counsel's third request, the jury was escorted back into the courtroom. At 5:25 PM, the judge stated the following to the jurors:

---

[2] At the time of jury selection, the court and the parties thought the case would be over by the end of that week.

**The Court:** All right.  I have received your note and counsel is aware of your notes – or your note as well.

And what I'm going to do at this time is to excuse you for today, but you're going to have to return on Tuesday to continue your deliberations.  I expect to see you on Tuesday, at 9:30. . . .

Counsel asked to approach the bench and the following conversation occurred:

**Prosecutor:** Judge, would you also instruct them not to investigate?

**Defense Counsel:** Yes.

**The Court:** Yes.

**Defense Counsel:** And since the Court won't be here Tuesday morning, I think that the Court maybe at this time should give them the Allen Charge.

**The Court:** No. No. No.  This is not a situation in which the Allen Charge applies.  It really is not.

**Prosecutor:** Thank you, Your Honor.

**The Court:** I'm not going to give the Allen Charge.

**Defense Counsel:** My exception is noted?

**The Court:** That's fine.

The trial judge issued additional instructions to the jury:

**The Court:** Okay.  There's just one other matter, and you've heard this more times than not, but I'll remind you.

Do not discuss the case with anyone.

. . . You must all be together, in the room, deliberating, before you can discuss the case.

Do not do any independent investigation, or any research, about anything concerning the matter.

As I've instructed you, your decision must be based upon what has been presented here during the course of the trial.

I expect that you will comply with my instructions.  It's the only way this process works.

So you are excused for today.  But again, I expect to see you on Tuesday, at 9:30.

On the following Tuesday, 6 September 2011, all of the jurors returned as instructed. Another judge of the Circuit Court, substituting for the presiding judge, swore the bailiff and instructed him to take the jury to the deliberation room and instruct them to resume their deliberations. Court recessed at 9:39 AM to await a verdict. At 10:45 AM, with the presiding judge back on the bench, court reconvened to receive the jury's verdict.[3] Before the jury was brought back into the courtroom, defense counsel renewed Nash's earlier mistrial motion based on the contents of the Note. The court denied the motion.

After the jury was re-seated, the foreperson announced that the jury found Nash guilty of murder in the first degree. At defense counsel's request, the courtroom clerk polled the jury. Each juror agreed with the verdict. The court dismissed the jury. Defense counsel renewed Nash's mistrial motion and stated his intent to file a motion for a new trial. The court reserved ruling on the mistrial and set a date for a hearing on the anticipated motion for a new trial.

On 28 October 2011, the court conducted a hearing on Nash's motion for a new trial. Nash argued, in sum, that the court erred in failing to grant a mistrial based on the Note and, alternatively, that the court's failure to give the requested *Allen* instruction, specifically the portion of the instruction that states that a juror should not change his or

---

[3] The record does not indicate the precise time at which the jury alerted the court that it reached a verdict.

her vote simply as an expedient to reach a verdict, warranted a new trial. The court denied Nash's mistrial motion and motion for a new trial.

Nash appealed to the Court of Special Appeals. In addition to the two arguments posed at the Circuit Court hearing on his motion for a new trial, Nash argued to the intermediate appellate court that the trial judge violated Maryland Rule 4-326(d) by failing to respond to the substance of the Note.

In an unreported opinion, the Court of Special Appeals affirmed the judgment of the Circuit Court. With regard to the argument that the Circuit Court should have declared a mistrial based on the allegations in the Note, the Court of Special Appeals held that the potential action of the juror who may have indicated she was willing to change her vote (the "Subject Juror"), as described in the Note, was not "conduct by a juror that would compromise the ability of the jury to render a fair and impartial verdict," and, therefore, did not constitute juror misconduct as such circumstances are recognized in Maryland. As to the contention that the trial judge erred in refusing to give the requested *Allen* instruction, the intermediate appellate court determined that the instruction would not have been proper because a jury deadlock did not exist. With respect to the last part of Nash's tri-fecta wager, that the trial judge violated Rule 4-326(d), the Court of Special Appeals concluded that the trial judge's actions constituted an adequate response to the Note.

Nash filed timely a Petition for Writ of Certiorari with this Court. We granted

Nash's Petition. *Nash v. State*, 432 Md. 466, 69 A.3d 474 (2013). We shall consider the

following question:[4]

---

[4] We rephrase slightly the question presented in Nash's opening brief, which read:

> Did the trial court commit reversible error when, after receiving a jury note indicating that one juror had changed her vote from not guilty to guilty "because she want[ed] to go home and not return," it (1) denied a mistrial motion without conducting a *voir dire* of the jury, (2) failed to take any action in response to the note other than recessing for the day, and (3) refused to give a modified Allen instruction as requested by defense counsel?

This question is a condensed version of the four questions Nash framed initially in his Petition for Writ of Certiorari:

> 1. Where the trial court received a note from the foreman that stated, "I don't believe the Defendant is being give[n] a fair verdict based on one of the juror[s] stating out loud that she will vote guilty because she want[s] to go home and not return! When she previously said no[t] guilty," did the trial judge abuse her discretion in denying defense counsel's mistrial motion and request for a supplemental instruction and by failing to conduct any *voir dire* of any of the jurors or otherwise address the issue with the jury but instead responded by recessing for the day based on the trial judge's conclusion that "it seems . . . that somebody was just tired and wants to go home"?
>
> 2. Does recessing for the day constitute a "respon[se]" as contemplated by Rule 4-326(d) and case law to a jury note "pertaining to the action"?
>
> 3. Under this Court's holding in *Johnson v. State*, 423 Md. 137 (2011), which presumes prejudice from juror misconduct and in such cases imposes on the trial judge a duty to *sua sponte voir dire* the jurors to ensure that they can still render a fair and impartial verdict, is juror misconduct limited to "improper communications with the parties, other jurors, or witnesses" and "conduct[ing] independent research

(continued…)

Did the trial court commit reversible error when, after receiving a jury note stating that one juror indicated a willingness to change her vote from not guilty to guilty "because she want[ed] to go home and not return," it (1) denied the defendant's mistrial motion without first conducting *voir dire* of the jury, (2) refused defense counsel's request to give a modified *Allen* instruction, and, (3) chose to recess over a three-day weekend and have the jurors return to continue deliberations?

We answer the question, in all of its parts, in the negative. For the following reasons, we shall affirm the judgment of the Court of Special Appeals.

## DISCUSSION

### I. The Trial Judge Did Not Abuse Her Discretion In Denying Nash's Mistrial Motion

Nash's first argument focuses on the Circuit Court's denial of his motion for a mistrial following the reading of the Note. He opines that the Subject Juror's reported statement constitutes juror misconduct, and that, by refraining from conducting *voir dire*

---

(…continued)

> or bring[ing] into the jury room material that was not supposed to be before the jurors," as the intermediate appellate court concluded, or does it also apply where the court receives information that one juror has changed her verdict based solely on her desire to go home rather than her honest belief as to the weight of the evidence?

4. May Maryland Pattern Jury Instruction 2:01, which in pertinent part instructs jurors to "not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict," *only* be given in a deadlock situation, or is it appropriate to give the instruction where a jury note indicates that a juror has changed her verdict from not guilty to guilty "because she want[ed] to go home and not return"?

-10-

of the jurors following receipt of the Note, the trial judge failed to accomplish one or more of three necessary things prior to acting on his motion for a mistrial: (1) receive evidence to rebut a presumption of prejudice to Nash arising from the Subject Juror's alleged conduct; (2) resolve factual questions to determine whether the presumption of prejudice was applicable or whether the judge had sufficient information upon which to exercise her discretion in ruling on the mistrial motion; or, (3) receive assurance from the jurors that they could render a fair and impartial verdict in light of the alleged misconduct. Failing to accomplish one or more of those things, Nash asserts, was an abuse of the trial judge's discretion and constitutes an error requiring reversal of Nash's conviction.

The State disagrees fundamentally with Nash's arguments and requests that we reject "Nash's attempt to 'pigeon-hole' the circumstances of his case into the case law that this Court and the Court of Special Appeals have developed addressing juror misconduct." The State asserts that the presumption of prejudice discussed in some of the authorities on which Nash relies is not applicable in this case because there was no "egregious juror-witness or juror-third party contact." In the State's view, the circumstances of the record of Nash's trial presented the trial judge with only a possibility that misconduct might occur prospectively, and, in such cases, the trial judge's decision not to conduct *voir dire* of the jurors is reviewed for an abuse of discretion. Under this deferential standard of review, the State contends, Nash has the burden to show that he was prejudiced so clearly that a reversal of the trial court's ruling is required, and "the record evidence demonstrates that he has failed to shoulder this

-11-

burden." Additionally, the State argues that there was no material fact-finding necessary for the trial judge to resolve prior to ruling on the mistrial motion.

The State concedes that to have done nothing in response to the Note would have been an abuse of the trial judge's discretion. The State notes, however, that the trial judge's "decision to recess was based upon her thoughtful consideration of the record and the jury's service up to that point in time."

Before we parse the merits of the parties' respective arguments, we pause to consider the lens through which we must review a trial court's disposition of a motion for a mistrial. Like many aspects of a trial, we review a court's ruling on a mistrial motion under the abuse of discretion standard. Although "abuse of discretion" is a term of art that courts have struggled continuously to define, we reiterated recently what we deem to be an appropriate description of the standard:

> In regards to the multitude of varying definitions of "abuse of discretion," as we recognized previously, "[o]ne of the more helpful pronouncements on the contours of the abuse of discretion standard comes from Judge ... Wilner's opinion in *North v. North*, 102 Md. App. 1, 648 A.2d 1025 (1994)," when he was the Chief Judge of the Court of Special Appeals. *King v. State*, 407 Md. 682, 697, 967 A.2d 790, 798 (2009). In *North*, Judge Wilner explained:
>
>> "Abuse of discretion" ... has been said to occur "where no reasonable person would take the view adopted by the [trial] court," or when the court acts "without reference to any guiding rules or principles." It has also been said to exist when the ruling under consideration "appears to have been made on untenable grounds," when the ruling is "clearly against the logic and effect of facts and inferences before the court," when the ruling is "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," when the ruling is "violative of fact and logic," or

-12-

> when it constitutes an "untenable judicial act that defies reason and works an injustice."

> *North*, 102 Md. App. at 13–14, 648 A.2d at 1031–32 (alterations in original) (emphasis added) (internal citations omitted). Judge Wilner observed that a "certain commonality [exists] in all these definitions": "the notion that **a ruling reviewed under an abuse of discretion standard will not be reversed simply because the appellate court would not have made the same ruling.**" *Id.*, 102 Md. App. at 14, 648 A.2d at 1032 (emphasis added). Rather, "[a] court's decision is an abuse of discretion when it is 'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *Gray v. State*, 388 Md. 366, 383, 879 A.2d 1064 (2005) (quoting *Dehn v. Edgecombe*, 384 Md. 606, 628, 865 A.2d 603 (2005)) (some internal quotation marks omitted).

> As Judge Wilner explained, "That kind of distance can arise in a number of ways." *North*, 102 Md. App. at 14, 648 A.2d at 1032. For example, the circuit court's ruling is "beyond the fringe" if it "either does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective." *Id.* Because we give such deference to a trial court's decision under the abuse of discretion standard of review, it is well established that "[t]he exercise of discretion ordinarily will not be disturbed by an appellate court." *Gatewood*, 388 Md. at 540–41, 880 A.2d at 330 (citing *Tierco Maryland, Inc. v. Williams*, 381 Md. 378, 413, 849 A.2d 504, 525 (2004)).

*Alexis v. State*, ___ Md. ___ (2014) (No. 45, September Term, 2013) (filed 24 March 2014) (slip. op. at 19-20).

Part of the difficulty in defining and parsing the abuse of discretion standard stems from the lack of fixed channels through which we can squeeze the Play-Doh of each trial judge's discretionary decision into the same analytical shape or mold. *See Alexis*, ___ Md. ___ (slip. op. at 20) ("The notion of a range of discretion . . . is not an immutable and invariable criterion in all of its myriad applications." (quoting *Canterbury Riding Condo. v. Chesapeake Investors, Inc.*, 66 Md. App. 635, 648, 505 A.2d 858, 864 (1986))).

Rather, the standard represents a flexible model whose range is dependent on the type of discretionary decision a trial judge is called upon to make and the relevant circumstances of the case. *See Washington v. State*, 424 Md. 632, 668, 37 A.3d 932, 952-53 (2012) (noting that, with respect to a motion for a new trial, a trial judge's discretion "'is not fixed and immutable'" but "'will expand or contract'" based on the circumstances of the case (quoting *Merritt v. State*, 367 Md. 17, 30, 785 A.2d 756, 764 (2001))).

Regarding the range of a trial judge's discretion in ruling on a mistrial motion, reviewing appellate courts afford generally a wide berth. *See Alexis*, ___ Md. ___ (slip. op. at 20) (noting that the range of a trial judge's discretion when assessing the merits of a mistrial motion, as with other decisions "[i]n handling the progress of a trial," is "'very broad and [his or her ruling] will rarely be reversed,'" as compared to other circumstances in which "'the discretionary range is far more narrow'") (quoting *Canterbury Riding Condo.*, 66 Md. App. at 648, 505 A.2d at 864). Competing forces affect potentially the range of discretion with respect to the particular mistrial motion in this case. On the one hand, an allegation of juror bias or misconduct may implicate a defendant's constitutional right to a fair and impartial verdict. *See Dillard v. State*, 415 Md. 445, 454-55, 3 A.3d 403, 408-09 (2010); *Jenkins v. State*, 375 Md. 284, 299-300, 825 A.2d 1008, 1017-18 (2003). On the other hand, declaring a mistrial is an extreme remedy not to be ordered lightly. *See Burks v. State*, 96 Md. App. 173, 187, 624 A.2d 1257, 1265 (1993) ("It is rather an extreme sanction that sometimes must be resorted to when such overwhelming prejudice has occurred that no other remedy will suffice to cure the prejudice."); *Ezenwa v. State*, 82 Md. App. 489, 518, 572 A.2d 1101, 1115 (1990)

("Because [a mistrial] is an extraordinary measure, it should only be granted where manifest necessity as opposed to light or transitory reasons, is shown.").

When a party moves for a mistrial based upon the conduct of jurors, we impose on trial judges the duty to conduct *voir dire sua sponte*, prior to ruling on the motion, in two sets of circumstances. The first circumstance occurs when a juror's actions constitute misconduct sufficient to raise a presumption of prejudice that must be rebutted before a mistrial motion may be denied. *See Jenkins*, 375 Md. at 327-30, 825 A.2d at 1034-35; *see also Wardlaw v. State*, 185 Md. App. 440, 453-54, 971 A.2d 331, 339 (2009). The second, ancillary circumstance occurs when a material and relevant fact regarding a juror's conduct is unknown or obscure and must be resolved before a trial judge has "sufficient information to determine whether the presumption of prejudice attached to the [conduct] or to rule on [the] motion for a mistrial." *Dillard*, 415 Md. at 457, 3 A.3d at 410. Nash asks us to consider a third circumstance, whether the absence of a *sua sponte voir dire* by the trial judge in the present case constituted reversible error for failure to obtain assurance from the jurors that they could render a fair and impartial verdict.

### A. Presumption of Prejudice

Our consideration of whether the facts of the present case raise a presumption of prejudice begins with a review of how Maryland's appellate courts approach this analysis. We considered the doctrine of presumptive prejudice for the first time in *Jenkins v. State*, 375 Md. 284, 825 A.2d 1008 (2003). In *Jenkins*, it was claimed that the trial court erred in denying the defendant's motion for a new trial based on an assertion that there was improper interaction between a State's witness and a juror during the trial.

-15-

The State's witness, a detective, and the juror happened (by chance) to attend the same weekend religious retreat, occurring during a recess in Jenkins's trial, where "in sum, they spoke of the trial, knew of each other's role, intentionally violated a court order, . . . went to lunch together, discussed personal details of their lives . . . and then failed to timely report the misconduct to the proper authorities." 375 Md. at 323-24, 825 A.2d at 1031-32.

Several days after the jury returned a guilty verdict against Jenkins, the female detective had occasion to be in the State's Attorney's Office on an unrelated matter and mentioned casually to the Assistant State's Attorney who prosecuted Jenkins's case her contact with the juror. The prosecutor notified immediately the court and Jenkins's defense counsel. The trial judge held an evidentiary hearing on the defense's motion for a new trial, at which the juror and detective both testified consistently (as above) regarding their contact at the retreat. The trial judge denied the motion, finding that the conduct, although improper, did not prejudice the defendant. *Jenkins*, 375 Md. at 288, 825 A.2d at 1010. Jenkins appealed to the Court of Special Appeals, which affirmed the judgment of the Circuit Court, concluding that the trial court did not abuse its discretion in finding that, if a presumption of prejudice was applicable, the State rebutted it. *See id.* (citing *Jenkins v. State*, 146 Md. App. 83, 116, 806 A.2d 682, 701 (2002)).

On certiorari review, we reversed the judgment of the intermediate appellate court. We observed that "private, intentional communications and/or contacts between jurors and witnesses are generally improper," and went on to quote from *Remmer v. United States*, 347 U.S. 227, 229, 74 S. Ct. 450, 451, 98 L. Ed. 654, 656 (1954):

"*In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial*, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."

*Jenkins*, 375 Md. at 301-02, 825 A.2d at 1018 (quoting *Remmer*, 347 U.S. at 229, 74 S. Ct. at 451, 98 L. Ed. at 656) (citations omitted) (emphasis added in *Jenkins*). We discussed the facts of *Remmer*, which involved an unknown person contacting a juror to suggest that the juror could profit from finding a verdict in favor of the defendant. The juror alerted the court. The trial judge held an ex parte hearing, without notifying the defendant of the incident. Additionally, the FBI conducted an investigation of the incident, which included questioning the jurors, during the trial. *See Jenkins*, 375 Md. at 302, 825 A.2d at 1019 (discussing *Remmer*). The Supreme Court held that the circumstances were prejudicial presumptively and remanded the case with instructions to the trial court to hold a hearing in which all parties could participate. *Id.*

We explained in *Jenkins* that, although this Court had "not had occasion to interpret the *Remmer* presumption of prejudice, the Court of Special Appeals has applied it in the case[s] of *Eades v. State*, 75 Md. App. 411, 541 A.2d 1001 (1988), and *Allen v. State*, 89 Md. App. 25, 597 A.2d 489 (1991) . . . ." *Id.* *Eades* involved a juror who, during a weekend recess, asked her husband, who was an Assistant United States Attorney, questions about the admissibility of hearsay evidence. The Court of Special Appeals held that, although the *Remmer* presumption of prejudice applied likely, the trial

-17-

court did not abuse its discretion in denying a motion for a new trial, after the court questioned the juror and determined that, because the juror did not discuss anything substantive about the facts of the case or how the jury was deliberating, the juror's question to her husband was innocuous. *See Eades*, 75 Md. App. at 424-25, 541 A.2d at 1008.

In *Allen*, a co-defendant had breakfast with an alternate juror, during which conversation he implicated himself and cleared his brother of some of the charges against him. The alternate juror related the co-defendant's statements to a sitting juror during a recess in deliberations. After being informed of the misconduct and conducting *voir dire* of the affected jurors, the trial court denied the defendant's motion for a mistrial. As in *Eades*, the Court of Special Appeals held that the *Remmer* presumption of prejudice applied, but that the presumption was rebutted by the jurors' responses to the trial judge's *voir dire* questions. *See Allen*, 89 Md. App. at 47-48, 597 A.2d at 500.

After our review in *Jenkins* of *Remmer*, *Eades*, and *Allen*, we rejected the State's argument that two later Supreme Court opinions[5] eroded the application of the *Remmer* presumption to cases such as Jenkins's, "where *egregious* juror *and* witness *misconduct* occurs." *Jenkins*, 375 Md. at 319, 825 A.2d at 1028 (emphasis in original). Even if "the Supreme Court has intended to erode the presumption of prejudice in cases such as the case *sub judice*, an interpretation with which we do not agree, we hold that Maryland's own Declaration of Rights requires such a presumption in limited egregious cases of juror

---

[5] *United States v. Olano*, 507 U.S. 725, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); *Smith v. Phillips*, 455 U.S. 209, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982).

*and* witness misconduct to ensure that a criminal defendant receives adequate due process." *Id.*

The Court of Special Appeals revisited the presumption of prejudice principle in *Wardlaw v. State*, 185 Md. App. 440, 971 A.2d 331 (2009). In *Wardlaw*, the trial court received a note from the jury, on the second day of deliberations, indicating that one of the jurors conducted Internet research on oppositional defiant disorder (ODD), a mental problem afflicting purportedly one of the State's witnesses, and "found that lying was a part of the illness." The note stated also "I am concerned that her statement [regarding ODD] is an undue influence on the rest of the jurors. Was this okay?" An additional sentence in the note, written in different handwriting than the rest of the note's contents, stated "And the foreman needs to know is lying part of the illness." *See Wardlaw*, 185 Md. App. at 445, 971 A.2d at 334. After reading the note to counsel for the parties, the trial judge denied defense counsel's motion for a mistrial. Rather than declaring a mistrial, the judge opted to give a curative instruction reminding the jurors of the given preliminary instruction to refrain from conducting any research or investigation. The judge explained that the jurors should disregard any research or discussion of such research that occurred during deliberations, and advised the jurors to base their verdict only on the evidence presented in the courtroom during the trial and nothing else. *Wardlaw*, 185 Md. App. at 445-46, 971 A.2d at 334-35.

The Court of Special Appeals reversed the judgment of the circuit court. The intermediate appellate court determined that the juror's research on ODD and subsequent reporting of her finding to the other jurors "constituted egregious misconduct," in part

because the credibility of the witness who was afflicted purportedly by ODD was "a crucial issue, as there was no evidence to substantiate her allegations," and that such egregious misconduct was "presumptively prejudicial to either the State or [Wardlaw]." *Wardlaw*, 185 Md. App. at 452, 971 A.2d at 338 (citing *Jenkins*, 375 Md. at 319, 825 A.2d at 1008; *Butler v. State*, 392 Md. 169, 189-91, 896 A.2d 359 (2006); *Summers v. State*, 152 Md. App. 362, 375, 831 A.2d 1134 (2003)). The Court of Special Appeals concluded that, because the trial judge did not *voir dire* the jury regarding the effect of the juror's research and statements on the deliberative process, "the presumption of prejudice was not rebutted and the trial court denied the motion without exercising its discretion." *Wardlaw*, 185 Md. App. at 453-54, 971 A.2d at 339.

On at least three occasions, Maryland's appellate courts concluded that allegations of juror or juror-related misconduct or mishaps were not sufficient to raise a presumption of prejudice. In *Bruce v. State*, 351 Md. 387, 718 A.2d 1125 (1998), on which the State relies here, we held the trial judge did not abuse his discretion when he declined to *voir dire* the jury, prior to denying the defendant's motion for a mistrial, regarding information displayed on an electronic bulletin board in the courthouse showing that the defendant had two other criminal cases pending simultaneously against him. 351 Md. at 396, 718 A.2d at 1129. In doing so, we upheld the trial judge's finding that there was no reasonable likelihood that the jurors saw or were prejudiced by the information on the bulletin board, and determined that "[t]he trial judge in the instant case exercised the discretion vested in him to deal with the 'problem' presented by the electronic bulletin board." *Bruce*, 351 Md. at 393, 718 A.2d at 1128.

-20-

In a quite recent case, the Court of Special Appeals determined that a juror's note stating "we have already looked it up," which the court received minutes after a prior note asking if the jurors could have a dictionary, was not the type of "excessive or egregious misconduct" or "serious juror misconduct" that would give rise to a presumption of prejudice. *Colkley v. State,* 204 Md. App. 593, 622-25, 42 A.3d 646, 663-64, *cert. granted*, 427 Md. 606, 50 A.3d 605, *and cert. denied*, 427 Md. 608, 50 A.3d 607, *and cert. granted*, 429 Md. 81, 54 A.3d 759 (2012), *rev'd on other grounds sub nom. Fields v. State*, 432 Md. 650, 69 A.3d 1104 (2013). Rather, the intermediate appellate court opined, although the jurors should not have looked up the word, "if a mistake this relatively minor could precipitate a mistrial, the criminal justice system would collapse." 204 Md. App at 625, 42 A.2d at 664.[6]

We declined also to conclude that a presumption of prejudice applied in a case quite similar factually to the present one. In *Butler v. State,* 392 Md. 169, 896 A.2d 359 (2006), the court received three notes from the jury. The first note, received at 8:30 PM, after four-and-a-half hours of deliberations, stated that the jurors could not agree. *Butler*, 392 Md. at 174-75, 896 A.2d at 362-63. Defense counsel moved for a mistrial. The State requested a modified *Allen* charge. *Butler*, 392 Md. at 175, 896 A.2d at 363. The trial judge found that an *Allen* charge would be coercive at that point, and decided to recess for the evening and have the jury return the following morning to resume deliberations. *Butler*, 392 Md. at 175-76, 896 A.2d at 363. The next morning, the court received a note

---

[6] In *Colkley*, counsel for both defendants declined the trial judge's offer to *voir dire* the jurors. 204 Md. App at 624 & n.2, 42 A.2d at 664 & n.2.

from the jury requesting to watch the videotape of closing arguments. *Butler*, 392 Md. at 176, 896 A.2d at 363. While the court was deciding whether to allow the jurors to watch the tape, the jury sent out a third note, which stated, "We have one juror who does not trust the police no matter the circumstance." *Id.*

Following argument from counsel for the parties, the court voiced its concern that if the statement in the third note was true, it would mean that one of the jurors committed perjury in his or her response to a *voir dire* question asked during the jury selection process. The court stated, "*I don't believe that necessarily one juror would never trust the police under any circumstances. I think that may just be an exhausted or frustrated reaction.*" 392 Md. at 177, 896 A.2d at 364 (emphasis in original). The court declined to give an *Allen* charge, but agreed to allow the jurors to watch the videotape of closing arguments. *Id.*

The jurors were brought into the courtroom and the judge advised them he would let them watch the videotape. In regard to their third note, the trial judge stated:

> The [third] note we're essentially going to ignore. It says we have one juror who does not trust the police no matter the circumstance. Anybody who had felt that way should have said so in *voir dire* so a challenge could have occurred, *and if anybody deliberates with that spirit **now**, I suggest they might be violating their oath.*

392 Md. at 178, 896 A.2d at 364. Counsel for both defendants objected, and moved for a mistrial on the ground that the judge's instruction was coercive. *Butler*, 392 Md. at 178-79, 896 A.2d at 365. The court denied the motions, and the jurors resumed deliberations after watching the videotape of closing arguments. *Butler*, 392 Md. at 179, 896 A.2d at

365. The jury found Butler guilty on all counts and his co-defendant, Lowery, guilty on the conspiracy counts. *Id.*

We reversed the judgment of the Court of Special Appeals, which had affirmed the judgment of the trial court. We held that the trial judge's instruction regarding the illegality of the one juror's position of not trusting the police "was potentially coercive and, as a result, [the defendants] may have been denied their constitutional right to a fair trial." 392 Md. at 192, 896 A.2d at 373. Prior to declaring our holding, however, we touched upon the presumption of prejudice principle. After noting *Jenkins* for the proposition that *voir dire* is a way in which to assess juror bias or prejudice, we concluded that "[t]he trial judge, however, is not required to conduct *voir dire* every time there is an allegation that the jury is prejudiced." *See Butler*, 392 Md. at 189-90, 896 A.2d at 371-72 (discussing *Jenkins* and *Bruce*).

Turning to Nash's case,[7] we decline his invitation to apply the presumption of prejudice doctrine in his case. Although the alleged statement of the Subject Juror, if

---

[7] Not included in our consideration of applicable case law (other than in passing) are a few cases in which Maryland's appellate courts mentioned the principle of the presumption of prejudice in the context of juror misconduct, but did not apply it directly or elaborate on its application. They are distinguishable significantly also on their facts. *See, e.g.*, *Williams v. State*, 394 Md. 98, 116, 904 A.2d 534, 545 (2006) ("Intentional concealment of relevant facts or the giving of false answers by a juror during the *voir dire* examination constitutes misconduct . . . and the occurrence of such misconduct raises a rebuttable presumption of prejudice . . . . Prejudicial jury misconduct constitutes grounds for a new trial." (quoting *People v. Blackwell*, 236 Cal. Rptr. 803, 805 (Cal. Ct. App. 1987))); *Wright v. State*, 131 Md. App. 243, 256, 748 A.2d 1050, 1057 (2000) ("In assessing the necessity of a new trial, the California Supreme Court stated the 'well settled' rule that 'such juror misconduct raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.' Finding no factor to rebut that

(continued…)

true, is troublesome on its face, it is different for two reasons, in our view, from the cases in which we applied the presumption. First, we agree with the State's argument that the reputed statement of the Subject Juror constituted but the possibility of future misconduct. Here—unlike in the cases considered so far in this opinion concerning juror contact with witness, parties to the case, or third parties, and independent investigations by jurors—the judge had the ability to prevent prejudice from occurring to Nash. In other words, the actual misconduct would have been if the Subject Juror acted on his or her stated desire of reaching a verdict merely to go home and not return, as opposed to threatening to act in that fashion. The judges in the cases discussed here attempted to cure any prejudice through *voir dire* questions, curative instructions, and efforts to obtain assurances of the jurors' abilities to reach impartial verdicts, but the misconduct had taken place already in the form of juror contact with witnesses or third parties, or the receipt and dissemination of outside evidence through independent investigations by jurors.

Nash relies on *Wilson v. Morris*, 317 Md. 284, 563 A.2d 392 (1989), *superseded by statute on other grounds*, Maryland Rule 5-407, *as recognized in Tuer v. McDonald*, 347 Md. 507, 701 A.2d 1101 (1997), in an effort to "illustrate the flaw in the State's argument that the note in this case presented only the possibility of juror misconduct." The presumption of prejudice principle was not mentioned in *Wilson*, perhaps because it

(…continued)
presumption, the court reversed the defendant's conviction." (citations omitted) (quoting *People v. Holloway*, 790 P.2d 1327 (Cal. 1990), *overruled on other grounds*, *People v. Stansbury*, 889 P.2d 588 (Cal. 1995))).

was a personal injury case and, thus, did not address the constitutional rights of a criminal defendant. Nonetheless, Nash contends that it stands for the proposition that "an allegation of patent juror bias" is all that is necessary to require a *sua sponte voir dire* by the court in response.

We are not persuaded by Nash's comparison of *Wilson* to the facts of the present case. Although we held that *voir dire* was necessary in *Wilson*, the "allegation of juror bias" in that case occurred in the middle of trial when the plaintiff recognized one of the sworn jurors as the person she had overheard saying, prior to jury selection, that "'these cases are costing too much money' and need to be stopped." *See Wilson*, 317 Md. at 302, 303, 563 A.2d at 400, 401. Therefore, the question in *Wilson* was whether a preexisting "patent juror bias" should have precluded the particular juror from being empaneled in that case. *Id.* Here, there is no evidence that the Subject Juror had a preexisting patent bias. To the contrary, the Note asserts that the Subject Juror stated, at some point earlier in the deliberations, a desire to find Nash not guilty, thus foreclosing the conclusion that she had a preexisting bias against Nash prior to jury selection or the commencement of deliberations. The trial judge's assessment that the Subject Juror's alleged statement was the result of fatigue, as opposed to a patent bias, was reasonable given the circumstances.

A second reason to decline to apply a presumption of prejudice in Nash's case is that, to the extent that the Subject Juror's statement could be considered actual misconduct, it does not fit within the type of "limited" circumstance in which the presumption applies. *Jenkins*, 375 Md. at 319, 825 A.2d at 1028. A statement made by a single juror, which did not concern the evidence or any of the witnesses, does not have

-25-

the same likelihood of poisoning the well of deliberations as the type of juror contact with witnesses, parties to the case, or third parties that took place in *Remmer*, *Jenkins*, *Eades*, and *Allen*. *See, e.g.*, *Summers v. State*, 152 Md. App. 362, 379, 831 A.2d 1134, 1143 (2003) (noting that an improper discussion between two jurors outside the presence of the rest of the jury results in a "greatly diminished" concern of a tainted verdict when compared to contact between a juror and a third party). Nor is such a statement likely to have as harmful an effect on deliberations as the type of independent investigation and resulting introduction of prejudicial "outside" evidence that occurred in *Wardlaw*. *See Dillard*, 415 Md. at 469, 3 A.3d at 417 (Adkins, J., dissenting) ("[T]here is no possibility that the jurors were influenced by some ex parte contact, or that their verdict was tainted by some inappropriate outside information or opinion. This fact isolates the instant case from *Jenkins* and [similar] cases . . . .").

It may be argued reasonably that the Subject Juror's alleged statement is more concerning than the misconduct occurring in *Colkley* and the potential for prejudice at issue in *Bruce*, and is, perhaps, more troublesome than the statement at issue in *Butler*, because the statement there prejudiced the State, which is not afforded the same constitutional protections as a criminal defendant, like Nash. In our view, however, the Subject Juror's reputed statement in the present case does not constitute the type of "excessive or egregious jury misconduct" that raises a presumption of prejudice. *Jenkins*, 375 Md. at 315, 825 A.2d at 1026. Because the presumption does not apply to the facts of the present case, the burden of proof as to the mistrial motion did not shift from Nash,

and, thus, the trial judge did not inherit the responsibility to conduct a *voir dire sua sponte* (in the absence of a request for *voir dire* from either of the parties).

To be clear, a *voir dire* of the jurors would not have been improper under the present circumstances. We hold only that, to the extent *voir dire* could have been useful in ferreting-out and resolving any potential prejudice, the burden was on Nash to request it.[8] Because Nash failed to request *voir dire* at the time of his motion for a mistrial, the trial judge did not abuse her discretion, on presumption of prejudice grounds, by refraining from conducting *voir dire sua sponte*.[9]

## B. Resolving Factual Issues

We consider next Nash's assertion that the trial judge did not have sufficient information upon which to exercise her discretion and, therefore, abused her discretion by

---

[8] Nash argues additionally that it would be impossible for him to prove prejudice in light of the longstanding rule against impeaching a verdict once rendered. *See Black v. State*, 426 Md. 328, 343-44, 44 A.3d 362 (2012) (citing *Stokes v. State*, 379 Md. 618, 637, 843 A.2d 64, 75 (2004); *Williams v. State*, 204 Md. 55, 70, 102 A.2d 714, 721 (1954)). His argument misses the point—the burden of proving prejudice from the Note belonged to Nash before the verdict was rendered. That prejudice, if any, could have been sorted-out or cured potentially through *voir dire*, had Nash requested it. The trial judge's duty to conduct *voir dire **sua sponte*** arises only where the presumption of prejudice applies (or, as discussed *infra* in the following section of this opinion, where factual issues must be resolved).

[9] We linger briefly to address one additional argument posed by Nash. He contends that "even if this Court does not presume prejudice and applies a harmless error analysis to this case, it would be impossible based on the lack of inquiry to demonstrate beyond a reasonable doubt that the failure to conduct a *voir dire* in response to the note in no way influenced the guilty verdict." Nash's argument is misplaced. Harmless error analysis only applies, as its name suggests, when we conclude first that an error occurred. Here, because we hold that the trial judge did not abuse her discretion, we find no error in her actions, and, thus, harmless error analysis in inapplicable.

failing to conduct *voir dire sua sponte* to obtain necessary information from the jurors before denying Nash's mistrial motion. We begin with a review of the two cases upon which Nash bases this assertion.

The seminal case upon which Nash relies is *Dillard v. State*, 415 Md. 445, 3 A.3d 403 (2010). The question of juror misconduct arose in that case when, during a lunch break while the trial was in progress, two jurors passed in a courthouse hallway two of the State's primary witnesses, both law enforcement officers who had testified, patted one of them on the back, and said, "Good job." *Dillard*, 415 Md. at 451, 3 A.3d at 406. The officers did not respond. Rather, they notified the prosecutor of the incident, who notified the court and defense counsel. *Id.* At Dillard's request, the trial judge brought in the jurors so that the officers could identify which jurors approached them, but the judge did not *voir dire* the jurors (nor did Dillard or his counsel request *voir dire*). *Dillard*, 415 Md. at 452, 3 A.3d at 407. The trial judge denied defense counsel's motion for a mistrial and his request to replace one of the offending jurors with the remaining alternate juror. *Id.* Ultimately, the jury convicted Dillard of three of the six offenses with which he was charged. *Id.*

Dillard appealed to the Court of Special Appeals, which affirmed the judgment of the circuit court. The intermediate appellate court concluded that: the jurors did not commit misconduct because they did not violate any of the trial court's instructions; the actions of the jurors were not egregious enough to raise a presumption of prejudice; it was not improper for the jurors to reach tentative opinions about Dillard's guilt or innocence; their comments did not demonstrate bias; and, it could be presumed that the

jurors followed the trial judge's subsequent instructions regarding the State's burden of proof and the presumption of innocence. *Dillard*, 415 Md. at 453, 3 A.3d at 407-08.

On certiorari review, we reversed the judgment of the Court of Special Appeals. We explained first that "private communications" between a juror and a third party are "'deemed presumptively prejudicial'" when they constitute "'excessive and egregious'" juror misconduct, and that, where the presumption of prejudice applies, "the burden of proof shifts to the State, which may overcome the presumption by showing that the contact was harmless." *Dillard*, 415 Md. at 455-56, 3 A.3d at 409 (citing *Remmer*, 347 U.S. at 229, 74 S. Ct. at 451, 98 L. Ed. at 656; *Jenkins*, 375 Md. at 340-41, 825 A.2d at 1041). We could not "determine from the record whether the contact between the jurors and Detective Smith was sufficiently egregious to create a presumption of prejudice to Dillard." Thus, we concluded that the trial court abused its discretion by denying the mistrial motion without conducting *voir dire* to investigate factual issues arising from the juror-witness contact. We explained the problem with the trial judge's failure to resolve the factual issues:

> The contact was particularly troubling for several reasons. First, Detective Smith was a key witness for the State. Contact between a juror and a key witness is more likely to be prejudicial than contact between a juror and an uninterested party. Second, the jurors specifically sought out the witness to make a comment about his testimony, as opposed to "mere casual contact," like saying "hello" or exchanging passing pleasantries. Further, the contact was not, on its face, an "instinctive human reaction" or a mere passing observation arising out of some detail of the testimony, as asserted by the Court of Special Appeals, but rather was a comment about the content of the witness's testimony that may be related to the question of guilt or innocence. Third, the contact is evidence that the jurors may have formed an opinion as to Dillard's guilt before Dillard presented his case. "If a juror has formed a fixed opinion on a defendant's guilt prior to deliberations, the

-29-

juror may stand by the opinion even if contradicted by subsequent evidence. A juror may also form premature conclusions without the benefit of final arguments, instructions of law, and jury deliberations." Finally, the fact that two jurors independently made the same comment about Detective Smith's testimony suggested that the jurors may have discussed the case or engaged in premature deliberation about the question of Dillard's guilt or innocence, or Detective Smith's credibility, prior to the completion of testimony. Because the content of the contact raised these potential factual issues, it was incumbent upon the trial judge to resolve the factual controversy that relates to the jurors' ability to render an impartial verdict.

*Dillard*, 415 Md. at 458, 3 A.3d at 410-11 (internal citations omitted).

Nash relies also on *Johnson v. State*, 423 Md. 137, 31 A.2d 239 (2011). *Johnson* involved juror access to factual information not presented during the trial. During deliberations, the trial judge received a note stating the following: "One of the jurors turned on the cell phone (using their own battery) and found a call was placed to [Defendant] at 3:08 AM. What should we do with this information disguard [sic] it?" *Johnson*, 423 Md. at 144, 31 A.2d at 243. The note referred to at least one of two cell phones that were admitted into evidence, presumably without batteries or with dead ones, and followed an earlier note in which the jurors inquired as to whether there was any evidence to corroborate a key witness's testimony that he received a call from the defendant at 3:08 AM on the morning of the crime in question. *Johnson*, 423 Md. at 143-44, 31 A.2d at 243.

The trial judge replied to the initial note by instructing the jurors that they had received all of the evidence and needed to rely on their memories of the evidence presented. *Johnson*, 423 Md. at 144, 31 A.2d at 243. The judge advised the parties and their counsel of the note indicating that a juror used the battery from his cell phone to

conduct an investigation into the evidence. Defense counsel moved for a mistrial. *Johnson*, 423 Md. at 145, 31 A.2d at 244. Rather than granting the mistrial motion, the judge elected to admonish the jury for violating his earlier instruction, reminded them to base their deliberations only on evidence presented during the trial, and instructed them to strike from their memories any additional evidence that was revealed by the use of the cell phone and any related discussion that may have occurred during their deliberations. *Johnson*, 423 Md. at 145-46, 31 A.2d at 244. Following that instruction, the judge asked the jurors, "Now is there anyone who is unable to comply with that instruction during deliberation? Raise your hand." None of the jurors responded. *Johnson*, 423 Md. at 146, 31 A.2d at 244. Four and a half hours later, the jury returned a verdict of "guilty" on four charges and "not guilty" on several other charges. *Johnson*, 423 Md. at 146, 31 A.2d at 245. The judge denied the defendant's motion for a new trial based on the jury conduct involving the cell phone. *Johnson*, 423 Md. at 147, 31 A.2d at 245.

On direct appeal, the Court of Special Appeals, in an unreported opinion, affirmed the judgment of the circuit court. The intermediate appellate court determined that: the juror's conduct did not rise to the level of conducting outside independent research; the jurors informed immediately the court; the evidence discovered was not in contradiction to testimony elicited during trial; and, following the judge's instructions and polling of the jury, the judge could observe the demeanor of the jurors and the impact on them of his curative instructions. *Id.* Accordingly, the appellate court was "unable to conclude that the juror's action in placing a battery into the cell phone amounted to egregious misconduct." *Id.*

-31-

On certiorari review, we reversed the judgment of the Court of Special Appeals. We declined to resolve the dispute between the parties regarding whether the conduct was sufficient to raise a presumption of prejudice. *Johnson*, 423 Md. at 151, 31 A.2d at 247. Instead, relying primarily on *Dillard*, we held that the trial judge's response "fell short of what was necessary before the court could have properly exercised its discretion to *deny* the requested mistrial," because the judge failed to conduct *voir dire* to resolve factual questions, such as "the identity of the investigating juror who obtained the information from the cell phone, who among the remaining jurors was aware of what the juror had learned, or the degree to which the extrinsic and highly prejudicial information [affected] some or all of the jurors." *Johnson*, 423 Md. at 154, 31 A.2d at 249.

Under the holdings of *Dillard* and *Johnson*, when a party moves for a mistrial following an allegation of juror misconduct, but does not request *voir dire* of the jury, a trial judge must conduct *voir dire sua sponte* if he or she lacks sufficient information regarding the juror's conduct from which to determine (1) whether a presumption of prejudice attaches, or, (2) whether a mistrial motion should be denied. In the present case, the only unresolved factual issues appear to be the identity of the Subject Juror, whether she said what the Note reported, and the number of other jurors who heard the Subject Juror's statement, if any. As discussed *supra*, a presumption of prejudice is not applicable to the facts of the present case, and determining the above unresolved facts would have had little or no material bearing on our conclusion as to application of the presumption. The question, then, is whether the trial judge lacked sufficient information upon which to exercise her discretion in ruling on Nash's motion for a mistrial.

We conclude that the trial judge had sufficient information before her to rule on the mistrial motion. She was not faced with the type of alarming factual issues arising from juror-witness contact that went unresolved in *Dillard*—i.e., what precipitated the contact between jurors and the witness, whether any of the jurors formed an opinion as to Dillard's guilt before he presented his case, and whether two or more jurors engaged inappropriately in discussions or conducted premature deliberation regarding Dillard's guilt or the credibility of the witness with whom the inappropriate contact was made.

Moreover, unlike in *Johnson*, the Subject Juror's alleged statement did not concern the introduction into deliberations of extrinsic "information . . . of central importance to what the jury ultimately had to decide." *Johnson*, 423 Md. at 153, 31 A.3d at 249. Nash argues that the Subject Juror's reputed statement concerned the issue of his guilt, and was, thus, of central importance to what the jury had to decide ultimately. His argument is misplaced. The information at issue in *Johnson* consisted of evidence not presented at trial that bore directly on the credibility of a key witness for the State. By contrast, the Subject Juror's supposed statement in the present case did not add to or otherwise affect the universe of evidence upon which the jury as a whole was to base its deliberation. Thus, the trial judge in Nash's case did not have essential factual issues to resolve before ruling on the mistrial motion.

Accordingly, we hold that the trial judge had sufficient facts upon which to base her ruling on the mistrial motion, and, thus, she did not abuse her discretion, on grounds of insufficient factual information, by denying the motion without first conducting *voir dire sua sponte*.

## C. Obtaining Assurance of a Fair and Impartial Verdict

We turn now to Nash's third challenge regarding the trial judge's denial of his mistrial motion—whether she abused her discretion by denying his motion without first "ask[ing] for or receiv[ing] any assurance that the jury's verdict would be fair, impartial, and based on the evidence after a clear indication to the contrary."

We think the range of discretion allotted to the trial judge in ensuring fairness and impartiality is greater than with respect to Nash's arguments based on presumption of prejudice and the alleged failure to resolve factual questions. Where a presumption of prejudice applies, garnering evidence through *voir dire* to rebut the prejudice is likely the "only method" at a trial judge's disposal to ensure a fair and impartial verdict. *Wardlaw*, 185 Md. App. at 453, 971 A.2d at 339. Thus, a trial judge's failure to conduct *voir dire* in such an instance likely will be an abuse of discretion. Similarly, where there are essential factual questions that must be answered before a judge has a sufficient quantum of information on which to base the exercise of her discretion, *voir dire* of the jurors is likely the only way that the judge may obtain access to the additional information he or she needs, and, thus, a failure to *voir dire* in those circumstances constitutes necessarily an abuse of discretion. As to the need to ensure fairness and impartiality, viewed in light of the particular facts of the present case, there was more than one avenue available to the trial judge before confronting the decision what to do with Nash's mistrial motion. *See, e.g.*, *Johnson*, 423 Md. at 149, 31 A.3d at 246 ("[D]epending upon the nature, scope, and timing of [alleged] misconduct, the judge may have one or more reasonable means of curing possible prejudice to the defendant.").

-34-

Where there exists more than one reasonable course a trial judge may take with respect to a discretionary decision, our job is not to weigh merely whether one option is better than the other. Nor is it to determine whether the trial judge's chosen course was the one we would have taken in his or her position. *Alexis*, ___ Md. ___ (slip op. at 19) (citing *North*, 102 Md. App. at 14, 648 A.2d at 1032). Our task, as discussed *supra*, is to determine whether the route the trial judge traveled "does not logically follow from the findings upon which it supposedly rests or has no reasonable relationship to its announced objective," and, thus, constituted an abuse of discretion. *Alexis*, ___ Md. ___ (slip op. at 20) (quoting *North*, 102 Md. App. at 14, 648 A.2d at 1032). In doing so, we must remember the trial judge's unique role and distinct advantage in evaluating questions of prejudice to a criminal defendant:

> The [trial] judge is physically on the scene, able to observe matters not usually reflected in a cold record. The judge is able to ascertain the demeanor of witnesses and to note the reaction of the jurors and counsel to inadmissible matters. That is to say, the judge has his finger on the pulse of the trial.

*State v. Hawkins*, 326 Md. 270, 278, 604 A.2d 489, 493 (1992). That observation applies equally to the trial judge's ability to ascertain the demeanor of jurors with regard to allegations of juror misconduct.

In light of the nature of our task, our understanding that the trial judge was the one with her "finger on the pulse of the trial," and the timing of the court's receipt of the Note, we cannot conclude that the trial judge's choice to respond to the Note by sending the jurors home and providing a curative instruction, instead of directly "ask[ing] for or receiv[ing]" an assurance of impartiality from the jurors, was an abuse of discretion.

Indeed, her conclusion that the reported comment of the Subject Juror in the Note was likely a product of fatigue and her decision to send the jurors home for the long weekend was not only within the range of what is "minimally acceptable" under the circumstances, *Alexis*, ___ Md. ___ (slip. op. at 19-20) (quoting *Gray*, 388 Md. at 383, 879 A.2d at 1064), it was on point with what we suggested was an appropriate response to very similar circumstances in *Butler*. In that case, after declining to apply a presumption of prejudice to the note stating that a particular juror "does not trust the police no matter the circumstance," we stated the following:

> In the case *sub judice*, we agree with the trial judge's assessment that the note "may just be an exhausted and frustrated reaction." As a result, his decision to allow the jury to continue deliberations may have been proper had he refrained from admonishing the juror.[10]

*Butler v. State*, 392 Md. at 190, 896 A.2d at 372.

If it was reasonable for the trial judge in *Butler* to deduce, from a note concerning a juror's lack of trust in law enforcement, that the jury was exhausted and frustrated and for that judge to allow the jury to continue deliberating without conducting *voir dire*, or otherwise asking for or receiving a direct assurance of impartiality, we cannot say that the trial judge in the present case abused her discretion. The Subject Juror's reported statement indicated that, on a Friday evening before a three-day weekend, after four days of trial, she wanted to go home. That statement is even more susceptible to interpretation

---

[10] The admonishment at issue, where the judge warned that a juror may be violating his oath, raised a question of coercion in that case. *See Butler*, 392 Md. at 181, 896 A.2d at 366. There is no coercion argument in the present appeal.

as being the result of fatigue and frustration, as the trial judge in the present case inferred, than the statement at issue in *Butler*, particularly in light of the fact that the note in *Butler* came from the jury in the morning, after they had been sent home the night before to take a rest from their deliberations. *See Butler*, 392 Md. at 175-76, 896 A.2d at 363. Thus, we cannot say here that it was grossly unreasonable for the trial judge to respond to the Note by allowing the jurors to go home for the long holiday weekend, with an additional instruction reminding them of their duties, before returning to continue their deliberations the following Tuesday.[11]

In reaching our conclusion as to the course of action chosen by the trial judge with regard to acting on Nash's mistrial motion, we decline to consider the events of Tuesday morning, when the jurors resumed their deliberations and reached a verdict of guilt in approximately one hour. In the State's effort to convince us of the legitimacy of the jury's verdict, it notes that: the jurors all returned on Tuesday morning; the foreperson, who signed the Note, expressed no further concern; and, none of the jurors voiced concern about the verdict during the polling process. Conversely, Nash argues that: we cannot require a foreperson or other juror to voice a concern repeatedly; the polling process consisted of an opportunity to answer a particular question—"Is your foreman's

---

[11] We are not persuaded by Nash's additional contention, raised at oral argument, that the trial judge could not have ascertained that the Subject Juror's statement was a result of fatigue without identifying (through *voir dire*), and assessing the demeanor of, the particular juror who made the statement. No juror identification was made in *Butler*. In our view, it is reasonable for a trial judge to sense fatigue, frustration, or restlessness emanating from a jury as a group, particularly in light of the timing of the court's receipt of the Note in the present case.

verdict your verdict?"—not a general opportunity to speak; and, the speed with which the jurors returned their verdict on Tuesday morning is evidence that the Subject Juror ended promptly her jury service, in the fashion her earlier statement suggested.

On this record, we do not know, and are not permitted to speculate about, what happened in the jury deliberation room on that Tuesday morning. We may not postulate, as the State seems to suggest, that the presence of all of the jurors on Tuesday morning and the lack of any additional notes or expressions of uncertainty from them indicates conclusively that all of the jurors followed the court's instructions. But, by the same token, we may not divine, as Nash seems to invite, that the relatively brief period of deliberation on Tuesday morning or the use of the words "and not return" in the Note following the statement that the Subject Juror wanted to "go home" indicate that the weekend break was not sufficient to prevent prejudice to Nash.

The information concerning the events of that Tuesday morning to which we are privy do not matter for the purposes of the standard of review by which we must measure the trial judge's denial of Nash's mistrial motion. The determination of whether she abused her discretion requires us to look only at whether her decision was within the realm of rationality at the time that she made it—the preceding Friday evening. As we discussed above, particularly in light of our analysis in *Butler*, we cannot say that the trial judge's actions on that Friday evening were so irrational.

Accordingly, we hold that the trial judge did not abuse her discretion in denying the mistrial motion. Even in light of a criminal defendant's constitutional rights, we cannot conclude that "a fair and impartial jury could not be had under the circumstances,"

-38-

or that the trial court's handling of Nash's mistrial motion resulted in "palpable injustice." *Rent-a-car Co. v. Globe & Rutgers Fire Ins. Co.*, 163 Md. 401, 408-09, 163 A. 702, 705 (1933). In the words of Justice Oliver Wendell Holmes, Jr., during his tenure on the Supreme Judicial Court of Massachusetts, "'The presiding ju[dge] was the best judge whether [the juror's conduct] did any harm in this particular case. If [s]he had given the defendant a new trial h[er] decision would not have been open to criticism, and we cannot say that [s]he was wrong in refusing one.'" *Rent-a-car Co.*, 163 Md. at 409, 163 A. at 705 (quoting *Commonwealth v. Poisson*, 32 N.E. 906, 907 (Mass. 1893)).

## II. The Trial Judge Did Not Abuse Her Discretion in Refusing to Give a Modified *Allen* Instruction

Like the decision whether to grant or deny a mistrial motion, a trial judge's decision whether to give a modified *Allen* charge is subject to review by this Court for an abuse of discretion. *See Kelly v. State*, 270 Md. 139, 144, 310 A.2d 538, 542 (1973).

The term "*Allen* instruction" is a legal eponym derived from a United States Supreme Court opinion "approv[ing] the use of an instruction in which the jury was specifically asked to conciliate their differences and reach a verdict." *Kelly v. State*, 270 Md. 139, 140 n.1, 310 A.2d 538, 540 n.1 (1973) (citing *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896)).

Due to concerns about coercion of jurors, "we have disapproved the giving of an original *Allen* charge, and have instead approved an instruction that closely follows the language of [ABA] Standard 15–4.4 (formerly Standard 5.4) of the Standards for Criminal Justice (1978, 1986 Supp.), provided there is no deviation in substance from the

-39-

language of that standard." *Graham v. State*, 325 Md. 398, 409, 601 A.2d 131, 136 (1992) (citing *Goodmuth v. State*, 302 Md. 613, 622-23, 490 A.2d 682 (1985); *Burnette v. State*, 280 Md. 88, 96, 371 A.2d 663 (1977); *Kelly v. State*, 270 Md. 139, 144, 310 A.2d 538 (1973)). We noted in *Graham* that Maryland Criminal Pattern Jury Instruction (MCPJI) 2:01, which is now commonly referred to as a "modified *Allen*" instruction or "*Allen*-type" instruction, conforms to the ABA Standard. *Id.* MCJPI 2:01, titled "Jury's Duty to Deliberate," reads:

> The verdict must be the considered judgment of each of you. In order to reach a verdict, all of you must agree. In other words, your verdict must be unanimous. You must consult with one another and deliberate with a view to reaching an agreement, if you can do so without violence to your individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. During deliberations, do not hesitate to reexamine your own views. You should change your opinion if convinced you are wrong, but do not surrender your honest belief as to the weight or effect of the evidence only because of the opinion of your fellow jurors or for the mere purpose of reaching a verdict.

Nash fixes on the final clause of the instruction, which, he argues, "specifically addresses the issue raised in the jury's note" here. He concedes that the modified *Allen* charge is given typically "in deadlock situations and the jury here did not indicate they were deadlocked," but he contends nonetheless that proper use of the instruction is not confined to deadlock situations. According to Nash, the trial judge "conducted an improper analysis by considering only deadlock situations" before denying his request for use of the instruction, in which she relied on factors applicable only to deadlocks, such as the length of deliberations leading up to the proposal to use the instruction.

The intermediate appellate court compounded the trial judge's error, according to Nash, when it relied in its opinion here on this Court's opinion in *Kelly v. State*, 270 Md. 139, 310 A.2d 538 (1973), in stating that, "for the modified *Allen* charge to be appropriate, a deadlock must exist," and concluding that a modified *Allen* charge "would not have been proper because there was no indication that the jury was deadlocked." According to Nash, *Kelly* does not suggest that an *Allen* charge may be given only in deadlock situations and, to the contrary, condones the use of an *Allen* charge in other circumstances. Nash notes that we have condoned the use of a modified *Allen* charge before deliberations begin, and concludes that the trial court and intermediate appellate court "failed to assess the effectiveness that the requested instruction may have had in addressing the concern raised in the note."

We can find no merit in Nash's argument. We have long held "that the decisions as to whether the ABA recommended *Allen*-type charge should be used and 'when to employ it ... are best left to the sound discretion of the trial judge.'" *Mayfield v. State*, 302 Md. 624, 630, 490 A.2d 687, 691 (1985) (quoting *Kelly* 270 Md. at 143, 310 A.2d at 538). Furthermore, a trial judge's exercise of that discretion in electing "to have the jury continue deliberating, **with or without an ABA approved *Allen*-type charge**, or whether to declare a mistrial, . . . . will furnish a ground for reversal only when the appellant demonstrates an abuse of discretion because of circumstances in a particular case." *Id.* at 632, 490 A.2d at 691-92 (emphasis added).

Nash's contentions, which rest on shaky premises, fall well short of demonstrating an abuse of discretion with regard to the trial judge's refusal to give the modified *Allen*

-41-

charge in the present case. As a threshold matter, despite Nash's appellate posture that the key to his request for the pattern instruction was the last clause, which he claims "addresses the issue raised in the jury's note," and faults the trial judge for not considering that, he did not refer to that clause in his actual request to the trial judge. To the contrary, the context in which counsel posed the request—"And since the Court won't be here Tuesday morning, I think that the Court maybe at this time should give them the *Allen* Charge"—is suggestive of concerns about a perceived, or potential for, deadlock.

Additionally, we are not persuaded by Nash's criticism of the intermediate appellate court's statement that for the modified *Allen* charge to be applicable "a deadlock must exist." Although Nash is correct that, in *Kelly*, we condoned the use of the modified *Allen* charge in at least one other context than a deadlock—specifically, prior to the commencement of deliberations—that is the only other context in which we have approved expressly the use of the modified *Allen* charge. *See Butler*, 392 Md. at 185, 896 A.2d at 369 ("Originally, the Allen-type charge was given when the jury communicated to the trial judge that they were deadlocked. Eventually, however, the Court allowed the use of an Allen-type instruction to the jury before deliberations commenced, in addition to the use of the Allen-type instruction under some circumstances if the jury appeared deadlocked." (citing *Thompson v. State*, 371 Md. 473, 810 A.2d 435 (2002); *Goodmuth v. State*, 302 Md. 613, 490 A.2d 682 (1985); *Mayfield*, 302 Md. 624, 490 A.2d 687 (1985); *Burnette v. State*, 280 Md. 88, 371 A.2d 663 (1977); *Kelly*, 270 Md. 139, 310 A.2d 538; *Leupen v. Lackey*, 248 Md. 19, 234 A.2d 573 (1967))).

Here, Nash concedes that he requested the modified *Allen* charge after deliberations commenced, but before a deadlock was apparent. Nash's logic, that because this Court allowed previously the use of the modified *Allen* charge in one context other than a deadlock, we should fault the trial court and intermediate appellate court for not applying the charge in yet another context, is faulty.

We need not decide whether the trial judge *could* have given the instruction in this case. The question before us is whether the decision of the trial judge, vested with a wide breadth of discretion in choosing whether to give a modified *Allen* charge, to refuse to give the instruction in the present case was "'well removed from any center mark imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable.'" *See Alexis*, ___ Md. ___ (slip. op. at 19-20) (quoting *Gray*, 388 Md. at 383, 879 A.2d at 1064). Given the facts of the present case and this Court's prior *Allen* charge jurisprudence, Nash has not presented us with a sufficient basis from which to conclude that the trial court's decision was so lacking. Accordingly, we hold that the trial judge did not abuse her discretion in refusing Nash's request to give the modified *Allen* charge.

### III. The Trial Judge Did Not Violate Maryland Rule 4-326(d)

We reach now Nash's final argument, that the trial judge's decision to recess for the day on Friday violated Maryland Rule 4-326(d) and was an "unsuitable response" to the Note. We address first the portion of Nash's argument concerning the plain meaning of the language of Rule 4-326(d). The first sentence of subsection (d), which is the only part of the Rule relevant to Nash's argument, reads: "The court shall notify the defendant

and the State's Attorney of the receipt of any communication from the jury pertaining to the action as promptly as practicable and in any event *before responding* to the communication." Md. Rule 4-326(d) (emphasis added). Nash imagines that the words "before responding" in the Rule presuppose a response to a note "pertaining to the action." Because, Nash contends, the Note in the present case pertained to the action within the meaning of the Rule, a response was required, and the trial judge's actions following receipt of the Note did not constitute a response as contemplated by the Rule. He asserts that recessing without addressing directly "the issue raised in the note" does not fit within the plain meaning of the regulatory use of the word "responding." Nash offers the Merriam-Webster Dictionary definition of the word "respond," which includes "to say something in return: make an answer," and argues that the trial judge did not "make an answer" to the foreman's concern expressed in the Note.

We reject Nash's plain language argument. Even assuming, for present purposes, that the Note "pertain[s] to the action," and that a response was required, we think the trial judge's actions are not violative of the plain language of the Rule. The first thing the judge did when the jury was brought back to the court room was to advise the jurors that she and counsel were aware of the Note. Next, she stated "what I'm going to do at this time is to excuse you for today, but you're going to have to return on Tuesday to continue your deliberations," before she gave additional instructions—which Nash seems to ignore—that, in pertinent part, address implicitly the issue raised in the Note, "As I've instructed you, your decision must be based upon what has been presented here during the course of the trial. I expect that you will comply with my instructions. It's the only

-44-

way this process works."[12] In our view, her statements did "say something in return" to the Note, and thus constituted a response within the meaning of the Rule's language.

Nor are we persuaded, that, to the extent that the judge's actions constituted a response, it was an unsuitable one under the Rule. We agree with the State that here, unlike in *State v. Baby*, 404 Md. 220, 946 A.2d 463 (2008), and similar cases on which Nash relies,[13] the Note did not pose a question from the jury regarding applicable law that required specific clarification. *See Baby*, 404 Md. at 263, 946 A.2d at 488 (requiring that the trial judge respond to [a jury's] questions in a manner that directly addressed the difficulty," where the "questions made explicit [the jury's] difficulty with an issue central to the case"). Rather, the Note posed a concern of one member of the jury about another juror's purported statement, which the trial judge addressed by recessing for the long

---

[12] Although, as Nash argues, the trial judge never gave an instruction mentioning explicitly that the jurors should not change their position merely to reach a verdict, the judge did give the following instruction before closing arguments:

> Your verdict must represent the considered judgment of each juror and must be unanimous. In other words, all 12 of you must agree. You must consider and decide this case fairly and impartially. You are to perform this duty without bias, or prejudice, as to any party. You should not be swayed by sympathy, prejudice, or public opinion. In making your decision you must consider the evidence in this case.

That instruction, combined with the additional instructions provided immediately before recessing for the holiday weekend, was, in our view, sufficient to apprise the jurors of their duty to deliberate fairly and impartially. "Jurors generally are presumed to follow the court's instructions, including curative instructions." *Dillard*, 415 Md. at 465, 3 A.3d at 415 (quoting *Ezenwa,* 82 Md. App. at 518, 572 A.2d at 1115).

[13] Nash also relies on *Lovell v. State*, 347 Md. 623, 702 A.2d 261 (1997), and *Price v. Glosson Motor Lines, Inc.*, 509 F.2d 1033, 1037 (4th Cir.1975), both of which are discussed in *Baby*.

weekend, based on her interpretation that the Subject Juror's assumed statement was the result of exhaustion or frustration, as opposed to confusion about the applicable law or the rules regarding how the jurors were required to discharge their duties. As discussed *supra* in Section I.C., we approved implicitly the same conclusion in *Butler* with regard to facts that were arguably less indicative of fatigue or frustration than the facts of the present case. Thus, we hold that the trial judge's decision to recess for the day, with the original and additional instructions she provided, did not constitute a violation of Md. Rule 4-326(d).

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Prince George's County
Case No. CT 09-1808X
Argued: March 6, 2014

IN THE COURT OF APPEALS

OF MARYLAND

No. 60

September Term, 2013

---

TROY SHERMAN NASH

v.

STATE OF MARYLAND

---

Barbera, C.J.
Harrell
Battaglia
Greene
Adkins
McDonald
Watts,

JJ.

---

Dissenting opinion by McDonald, J.,
which Battaglia and Adkins, JJ., join,
dissenting in part.

---

Filed: June 20, 2014

On behalf of the majority, Judge Harrell has done his usual thorough and thoughtful review of the case law in this area. However, I cannot agree with the Majority's conclusion that the trial judge need not have conducted any further inquiry in this case.

Here the trial judge received a note from the jury foreman reporting that a juror, who earlier in the deliberations had expressed a belief that the defendant was not guilty, had more recently stated an intention to change her vote for the sole purpose of going home sooner. While the Majority concedes that this note was "troublesome on its face," it ultimately concludes that the note did not raise "the type of alarming factual issues" as two prior cases in which this Court held that it was an abuse of discretion for a trial court to deny a defense motion for a mistrial without conducting further investigation. Majority slip op. at 24, 33.

But what could be more alarming than that a juror, believing that a defendant is innocent, votes "guilty" simply in order to go home? Such misconduct would strike at the heart of the jury's function. Neither of the two cases that the Majority distinguishes involved conduct so central to the decision-making process. Yet this Court held that further inquiry was mandatory in both instances.[1]

---

[1]In *Dillard v. State*, 415 Md. 445, 451, 3 A.3d 403 (2010), during a chance encounter between two jurors and two law enforcement officers who had testified at the trial, the jurors patted one of the officers on the back and said "good job." This Court held that, without further inquiry by the trial court, it was impossible to determine whether that contact was "sufficiently egregious" to create presumption of prejudice, and ordered a new trial. In *Johnson v. State*, 423 Md. 137, 31 A.2d 239 (2011), a juror was able, during deliberations, to turn on a cell phone that had been introduced into evidence and found that the phone corroborated a witness' testimony about the timing of a call made from that phone. The trial court instructed the jury that they should rely solely on evidence admitted during the trial and should ignore any information from the cell phone; it further ascertained that the jurors

(continued...)

Perhaps the foreman misunderstood the juror. Perhaps the juror did not mean what she said, and in fact had not abandoned her oath to decide the case based on the evidence. Perhaps the trial judge's instinct that the note was a product of juror fatigue after a long day was correct. Had the judge conducted an inquiry, I would have accorded great deference to whatever conclusion she reached. But she did not do so. And so the trial judge had little more information than we do on which to assess whether there was juror misconduct or not.

Although the trial judge did not respond directly to the question posed by the foreman, hopefully the juror who allegedly made the statement – and whichever jurors heard her – understood that they were to base their verdict on the law and the evidence. However, the quick return of the jury verdict on Tuesday would be perfectly consistent with a juror voting "guilty" just to go home and a foreman who may have surmised, from the court's inaction, that such a statement was of no moment.

We like to think that our juries approach their task like the one in *Twelve Angry Men* ultimately did – where an earnest examination of the evidence prevails over the desire for an early exit from a civic obligation, overcomes whatever prejudices and predispositions we individually bring to the jury room, and enables a jury to work toward a consensus that is a

---

[1](...continued)
intended to follow that instruction. Nevertheless, this Court later reversed the defendant's conviction on the ground that the trial court should have conducted further investigation into circumstances of the juror's examination of the cell phone. In neither *Dillard* nor *Johnson* was there an allegation that a juror had expressed an intention to violate the juror's oath.

2

just result.[2]  Perhaps that is how this jury worked, and I hope that is true.  But, in my view, when a jury foreman reports that one of the jurors is ready to concede his or her vote for reasons unrelated to the evidence or the law, a trial judge should do more than simply hope that it is not true.

Judge Battaglia and Judge Adkins join this opinion.

---

[2]In the film *Twelve Angry Men* (Orion-Nova Productions 1957, screenplay by Reginald Rose), a jury in a murder case takes a preliminary vote upon entering the jury room and finds itself to be 11-1 in favor of conviction.  Through questioning by the lone hold-out, and the jurors' prodding of one another that exposes their individual aspirations and predispositions, they eventually reach a consensus that the prosecution had not proven its case beyond a reasonable doubt.  *See* Ellsworth, *One Inspiring Jury*, 101 Mich. L. Rev. 1387 (2003).  Ironically, it has been noted that at least one aspect of the deliberation portrayed in the film might itself constitute juror misconduct.  *Id*. at 1399 n.4.